# SQUARE D CO. ET AL. v. NIAGARA FRONTIER TARIFF BUREAU, INC., ET AL.

No. 85–21.   Argued March 3, 1986—Decided May 27, 1986

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, *post*, p. 424.

*Douglas V. Rigler* argued the cause for petitioners. With him on the briefs were *Linda Heller Kamm, Michael Fischer, Joseph E. Zdarsky, H. Laddie Montague, Arnold Levin,* and *Howard Sedran.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Ginsburg, Deputy Assistant Attorney General Cannon, Jerrold J. Ganzfried, Robert B. Nicholson, Robert S. Burk, Henri F. Rush, Timm L. Abendroth,* and *Jim J. Marquez.*

*Donald L. Flexner* argued the cause for respondents. With him on the brief were *Clifton S. Elgarten, Peter A. Greene, Charles L. Freed, John W. Bryant, Bryce Rea, Jr., Donald E. Cross, Lester M. Bridgeman, Louis E. Emery,* and *Joel B. Harris.**

JUSTICE STEVENS delivered the opinion for the Court.

Petitioners have alleged that rates filed with the Interstate Commerce Commission by respondent motor carriers during the years 1966 through 1981 were fixed pursuant to an agreement forbidden by the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1 *et seq.* The question presented is whether the carriers are subject to treble-damages liability in a private antitrust action if the allegation is true.

---

*Briefs of *amici curiae* urging affirmance were filed for the Association of American Railroads by *Richard T. Conway, Ralph J. Moore, Jr., John Townsend Rich, Stephen J. Hadley,* and *Kenneth P. Kolson;* and for the National Motor Freight Traffic Association, Inc., et al. by *Patrick McEligot, William W. Pugh,* and *Kevin M. Williams.*

Briefs of *amici curiae* were filed for American Information Technologies Corp. et al. by *J. Paul McGrath;* for C. D. Ambrosia Trucking Co., Inc., et al. by *Lawrence R. Velvel* and *Bruce J. Ennis, Jr.;* and for the Western Fuels Association, Inc., et al. by *Frederick L. Miller, Jr.*

The question requires us to give careful consideration to the way in which Congress has accommodated the sometimes conflicting policies of the antitrust laws and the Interstate Commerce Act, 49 U. S. C. § 10101 *et seq.* (1982 ed. and Supp. II). Our analysis of the question will include three components: (1) the sufficiency of the complaint allegations in light of the bare language of the relevant statutes; (2) the impact of the Court's decision of an analogous question in 1922 in *Keogh* v. *Chicago & Northwestern R. Co.*, 260 U. S. 156; and (3) the extent to which the rule of the *Keogh* case remains part of our law today.

I

Two class-action complaints making parallel allegations against the same six defendants were filed in the United States District Court for the District of Columbia and then transferred to Buffalo, New York, where a similar action brought by the United States was pending. The Government case was ultimately settled by the entry of a consent decree;[1] after the two private actions had been consolidated, the District Court granted a motion to dismiss the complaints. We therefore take the well-pleaded facts as true.[2]

Five of the respondents are Canadian motor carriers engaged in the transportation of freight between the United States and Canada. They are subject to regulation by the Ontario Highway Transport Board, and by the Interstate

---

[1] The consent decree enjoins respondents from "harassing, discouraging, coercing, or threatening in any way any motor carrier to withdraw, forbear from filing, or modify in any way said carrier's planned or actual independent rates," and from discussing rates except "within an authorized ratemaking body of a rate bureau with a rate agreement." *United States* v. *Niagara Frontier Tariff Bureau, Inc.*, 1984-2 Trade Cases ¶ 66,167, pp. 66,533–66,535 (WDNY 1984).

[2] See *Hishon* v. *King & Spalding*, 467 U. S. 69, 73 (1984); *McLain* v. *Real Estate Bd. of New Orleans*, 444 U. S. 232, 246 (1980); *Hospital Building Co.* v. *Trustees of Rex Hospital*, 425 U. S. 738, 746 (1976); *Scheuer* v. *Rhodes*, 416 U. S. 232, 236 (1974); *Conley* v. *Gibson*, 355 U. S. 41, 45–46 (1957).

Commerce Commission (ICC). They are all members of the Niagara Frontier Tariff Bureau, Inc. (NFTB), which is also a defendant. NFTB is a nonprofit corporation organized to engage in collective ratemaking activities pursuant to an agreement filed with and approved by the ICC.[3]

Petitioners are corporations that have utilized respondents' services to ship goods between the United States and Canada for many years. In their complaints, they allege that, at least as early as 1966 and continuing at least into 1981, respondents engaged in a conspiracy "to fix, raise and maintain prices and to inhibit or eliminate competition for the transportation of freight by motor carrier between the United States and the Province of Ontario, Canada without complying with the terms of the NFTB agreement and by otherwise engaging in conduct that either was not or could not be approved by the ICC."[4]

The complaints allege five specific actions in furtherance of this conspiracy. First, senior management officials of the NFTB used a "Principals Committee," which was not authorized by the NFTB agreement, to set rates and to inhibit competition.[5] Second, respondents set and controlled NFTB rate levels without complying with the notice, publication, public hearing, and recordkeeping requirements of the NFTB agreement and ICC regulations.[6] Third, respondents planned threats, retaliation, and coercion against NFTB members to inhibit independent actions.[7] Fourth, respondents actually used pressures, threats, and retaliation to inter-

---

[3] See *Niagara Frontier Tariff Bureau, Inc.—Agreement*, 297 I. C. C. 494 (1955).

[4] Square D complaint, ¶ 22, App. 11; Big D complaint, ¶ 19, App. 24.

[5] Square D complaint, ¶ 23(a), App. 12; Big D complaint, ¶ 20(a), App. 24.

[6] Square D complaint, ¶ 23(b), App. 12; Big D complaint, ¶ 20(b), App. 24.

[7] Square D complaint, ¶ 23(c), App. 12; Big D complaint, ¶ 20(c), App. 24.

fere with independent actions.[8] Finally, still in furtherance of the conspiracy, respondents filed tariffs with the ICC.[9]

Because of respondents' unlawful conduct, the complaints continue, petitioners and the members of the large class of shippers that they represent have paid higher rates for motor carrier freight transport than they would have paid in a freely competitive market.[10] They seek treble damages measured by that difference, as well as declaratory and injunctive relief.

The legal theory of the complaints is that respondents' conspiracy is not exempted from a private antitrust, treble-damages action even though the rates that respondents charged were filed with the ICC, as required by law. The complaints note that the ICC requires motor carriers to file tariffs containing all their rates, to make the tariffs available for public inspection, and to give advance notice of any changes in the filed rates.[11] Although the ICC has the power to determine those rates, the rates are set by the carriers, not the ICC, in the first instance.[12] The Reed-Bulwinkle Act, enacted in 1948, expressly authorizes the ICC to grant approval to agreements establishing rate bureaus for the purpose of setting rates collectively.[13] The joint setting of rates pursuant to such agreements is exempted from the antitrust laws, but the statute strictly limits the exemption to actions that conform to the terms of the agreement approved by the

---

[8] Square D complaint, ¶ 23(d), App. 12; Big D complaint, ¶ 20(d), App. 25.

[9] Square D complaint, ¶ 23(e), App. 12; Big D complaint, ¶ 20(e), App. 25.

[10] Square D complaint, ¶¶ 24(a)–(d), App. 12–13; Big D complaint, ¶¶ 21(a)–(c), App. 25.

[11] Square D complaint, ¶ 16, App. 9 (citing 49 U. S. C. § 10762); Big D complaint, ¶ 13, App. 22 (same).

[12] Square D complaint, ¶ 16, App. 9 (citing 49 U. S. C. § 10704); Big D complaint, ¶ 13, App. 22 (same).

[13] Square D complaint, ¶ 17, App. 10 (citing 49 U. S. C. § 5b, now codified at 49 U. S. C. § 10706(b)(2)); Big D complaint, ¶ 14, App. 22 (same).

ICC.[14] In this case, according to the theory of the complaints, the activities of respondents were not authorized by the NFTB agreement; hence the alleged conspiracy was not exempt from the antitrust laws, and, indeed, blatantly violated those laws.

Under the plain language of the relevant statutes, it would appear that petitioners have alleged a valid antitrust action. The stated activities are clearly within the generally applicable language of the antitrust laws;[15] nothing in the language of the Interstate Commerce Act, moreover, necessarily precludes a private antitrust treble-damages remedy for actions that are not specifically immunized within the terms of the Reed-Bulwinkle Act.[16]

The District Court nevertheless dismissed the complaints on the authority of the *Keogh* case. 596 F. Supp. 153 (WDNY 1984). The Court of Appeals for the Second Circuit affirmed insofar as the District Court's judgment dismissed the claims for treble damages based on respondents' filed rates, but remanded for a further hearing to determine whether petitioners are entitled to injunctive relief and to give them an opportunity to amend their complaints to state possible claims for damages not arising from the filed tariffs. 760 F. 2d 1347 (1985). We granted certiorari to consider whether the rule of the *Keogh* case was correctly applied in barring a treble-damages action based on the filed tariffs, and,

---

[14] Under the Reed-Bulwinkle Act, as currently codified, "[i]f the [Interstate Commerce] Commission approves the agreement, it may be made and carried out under its terms and under the conditions required by the Commission, and the antitrust laws, as defined in the first section of the Clayton Act (15 U. S. C. 12), do not apply to parties and other persons with respect to making or carrying out the agreement." 49 U. S. C. § 10706(b)(2).

[15] See, *e. g.,* 15 U. S. C. § 1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal").

[16] See n. 14, *supra.*

if so, whether that case should be overruled. 474 U. S. 815 (1985).

## II

In *Keogh*, as in this case, a shipper's complaint alleged that rates filed with the ICC by the defendants had been fixed pursuant to an agreement prohibited by the Sherman Act. The rates had been set by an agreement among executives of railroad companies "which would otherwise be competing carriers," 260 U. S., at 160. They were "higher than the rates would have been if competition had not been thus eliminated." *Ibid.* The shipper claimed treble damages measured by the difference between the rates set pursuant to agreement and those that had previously been in effect.

In their special plea, defendants averred that every rate complained of had been filed with the ICC and that, after hearings in which Keogh had participated, the rates had been approved by the Commission. That approval established that the fixed rates were "reasonable and non-discriminatory," *id.*, at 161, but it did not foreclose the possibility that slightly lower rates would also have been within the zone of reasonableness that the Commission would also have found lawful under the Interstate Commerce Act. Nor did the ICC's approval require rejection of Keogh's contention that the combination among the railroads violated the Sherman Act.[17] The Court nevertheless held that Keogh, a private shipper, could not "recover damages under § 7 because he lost the ben-

---

[17] "All the rates fixed were reasonable and non-discriminatory. That was settled by the proceedings before the Commission. *Los Angeles Switching Case*, 234 U. S. 294. But under the Anti-Trust Act, a combination of carriers to fix reasonable and non-discriminatory rates may be illegal; and if so, the Government may have redress by criminal proceedings under § 3, by injunction under § 4, and by forfeiture under § 6. That was settled by *United States v. Trans-Missouri Freight Association*, 166 U. S. 290, and *United States v. Joint Traffic Association*, 171 U. S. 505. The fact that these rates had been approved by the Commission would not, it seems, bar proceedings by the Government." 260 U. S., at 161–162.

efit of rates still lower, which, but for the conspiracy, he would have enjoyed." *Id.*, at 162.

The Court reasoned that the ICC's approval had, in effect, established the lawfulness of the defendant's rates,[18] and that the legal right of the shippers against the carrier had to be measured by the published tariff. It therefore concluded that the shipper could not have been "injured in his business or property" within the meaning of § 7 of the Sherman Act by paying the carrier the rate that had been approved by the ICC. Justice Brandeis explained:

> "Section 7 of the Anti-Trust Act gives a right of action to one who has been 'injured in his business or property.' Injury implies violation of a legal right. The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The

---

[18] "A rate is not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the Anti-Trust Act. What rates are legal is determined by the Act to Regulate Commerce. Under § 8 of the latter act the exaction of any illegal rate makes the carrier liable to the 'person injured thereby for the full amount of damages sustained in consequence of any such violation' together with a reasonable attorney's fee. Sections 9 and 16 provide for the recovery of such damages either by complaint before the Commission or by an action in a federal court. If the conspiracy here complained of had resulted in rates which the Commission found to be illegal because unreasonably high or discriminatory, the full amount of the damages sustained, whatever their nature, would have been recoverable in such proceedings. *Louisville & Nashville R. R. Co.* v. *Ohio Valley Tie Co.*, 242 U. S. 288. Can it be that Congress intended to provide the shipper, from whom illegal rates have been exacted, with an additional remedy under the Anti-Trust Act? See *Meeker* v. *Lehigh Valley R. R. Co.*, 162 Fed. 354. And if no remedy under the Anti-Trust Law is given where the injury results from the fixing of rates which are illegal, because too high or discriminatory, may it be assumed that Congress intended to give such a remedy where, as here, the rates complained of have been found by the Commission to be legal and while in force had to be collected by the carrier?" *Id.*, at 162.

rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier. *Texas & Pacific R. R. Co.* v. *Mugg,* 202 U. S. 242; *Louisville & Nashville R. R. Co.* v. *Maxwell,* 237 U. S. 94; *Atchison, Topeka & Santa Fe Ry. Co.* v. *Robinson,* 233 U. S. 173; *Dayton Iron Co.* v. *Cincinnati, New Orleans & Texas Pacific Ry. Co.,* 239 U. S. 446; *Erie R. R. Co.* v. *Stone,* 244 U. S. 332. And they are not affected by the tort of a third party. Compare *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Fink,* 250 U. S. 577. This stringent rule prevails, because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated." *Id.,* at 163.

In this case, unlike *Keogh,* respondents' rates, established in the tariffs that had been filed with the ICC, were not challenged in a formal ICC hearing before they were allowed to go into effect. They were, however, duly submitted, lawful rates under the Interstate Commerce Act in the same sense that the rates filed in *Keogh* were lawful. Under the Court's holding in that case, it therefore follows that petitioners may not bring a treble-damages antitrust action.[19] The question, then, is whether we should continue to respect the rule of *Keogh.*

### III

Petitioners, supported by the Solicitor General of the United States, ask us to overrule *Keogh.* They submit that

---

[19] In their brief, petitioners argue that, even under *Keogh,* their treble-damages action should not have been dismissed because there was no ICC hearing in this case and because *Keogh* did not involve allegations of the type of covert legal violations at issue here. Brief for Petitioners 10–11. The Court of Appeals, however, properly concluded that *Keogh* was not susceptible to such a narrow reading: "Rather than limiting its holding to cases where, as in *Keogh,* rates had been investigated and approved by the ICC, the Court said broadly that shippers could not recover treble-damages for overcharges whenever tariffs have been filed." 760 F. 2d, at 1351.

*Keogh* was implicitly rejected in the Reed-Bulwinkle Act and in the Motor Carrier Act of 1980, Pub. L. 96–296, 94 Stat. 793; that *Keogh* in effect created an implied immunity from the antitrust laws and that its reasoning is thus inconsistent with later cases, particularly *Carnation Co.* v. *Pacific Westbound Conference,* 383 U. S. 213 (1966); and that the rationales of the *Keogh* decision are no longer valid.

Petitioners argue that the Reed-Bulwinkle Act, by delineating an antitrust immunity for specific ratemaking activities,[20] repudiated *Keogh*'s holding that shippers may not bring treble-damages actions in connection with ICC-filed tariffs. In our view, however, it is not proper to read that statute as supplanting the *Keogh* rule with a narrow, express exemption from the antitrust laws.

The legislative history of Reed-Bulwinkle explains that it was enacted, at least in part, in response to this Court's decision in *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439 (1945).[21] In that case, after restating the holding in *Keogh,* the Court held that, although Georgia could not maintain a suit under the antitrust laws to obtain damages, it could obtain injunctive relief against the collective ratemaking procedures employed by the railroads.[22] The Reed-Bulwinkle Act

---

[20] See ch. 491, 62 Stat. 472, now codified at 49 U. S. C. § 10706(b).

[21] See, *e. g.,* H. R. Rep. No. 1100, 80th Cong., 1st Sess., 4 (1947) (citing "[t]he Georgia suit" and other cases, and emphasizing "[t]hese developments have caused grave concern among all those having direct interest in transportation, who see in the situation a threat to long-standing practices in the transportation industry that were developed in cooperation with the shippers and have proved their worth"). See also 760 F. 2d, at 1356–1360 (reviewing legislative history of Reed-Bulwinkle Act).

[22] "We think it is clear from the *Keogh* case alone that Georgia may not recover damages even if the conspiracy alleged were shown to exist. That was a suit for damages under § 7 of the Sherman Act. 26 Stat. 210. The Court recognized that although the rates fixed had been found reasonable and non-discriminatory by the Commission, the United States was not barred from enforcing the remedies of the Sherman Act. 260 U. S. pp. 161–162. It held, however, that for purposes of a suit for damages a rate was not necessarily illegal because it was the result of a conspiracy in restraint of trade. The legal rights of a shipper against a carrier in re-

thus created an absolute immunity from the antitrust laws for approved collective ratemaking activities.

Nothing in the Act or in its legislative history, however, indicates that Congress intended to change or supplant the *Keogh* rule that other tariff-related claims, while subject to governmental and injunctive antitrust actions, did not give rise to treble-damages antitrust actions. On the contrary, the House Report expressly stated that, except for creating the new exemption, the bill left the antitrust laws applicable to carriers unchanged "so far as they are now applicable." [23] Particularly because the legislative history reveals clear congressional awareness of *Keogh*,[24] far from supporting petitioners' position, the fact that Congress specifically addressed this area and left *Keogh* undisturbed lends powerful support to *Keogh*'s continued viability.

Similarly, petitioners and the Solicitor General argue that private treble-damages actions would further the congressional policy of promoting competition in the transportation industry reflected in the Motor Carrier Act of 1980.[25] We

spect to a rate are to be measured by the published tariff. That rate until suspended or set aside was for all purposes the legal rate as between shipper and carrier and may not be varied or enlarged either by the contract or tort of the carrier. . . . The reasoning and precedent of that case apply with full force here. But it does not dispose of the main prayer of the bill, stressed at the argument, which asks for relief by way of injunction." 324 U. S., at 453.

[23] "The bill here reported leaves the antitrust laws to apply with full force and effect to carriers, *so far as they are now applicable*, except as to such joint agreements or arrangements between them as may have been submitted to the Interstate Commerce Commission and approved by that body upon a finding that, by reason of furtherance of the national transportation policy as declared in the Interstate Commerce Act, relief from the antitrust laws should be granted." H. R. Rep. No. 1100, 80th Cong., 2d Sess., 5 (1947) (emphasis added).

[24] See 760 F. 2d, at 1359–1360 (reviewing attention to *Keogh* in the congressional consideration of the the Reed-Bulwinkle Act).

[25] As we recently pointed out, the "legislative history of the Act is clear that, beyond the bounds of immunity granted in § 10706(b)(3), Congress wanted the forces of competition to determine motor-carrier tariffs." *ICC* v. *American Trucking Assns., Inc.*, 467 U. S. 354, 367 (1984). See also

may assume that this is the case—indeed, we may assume that petitioners are correct in arguing that the *Keogh* decision was unwise as a matter of policy—but it nevertheless remains true that Congress must be presumed to have been fully cognizant of this interpretation of the statutory scheme,[26] which had been a significant part of our settled law for over half a century, and that Congress did not see fit to change it when Congress carefully reexamined this area of the law in 1980. Petitioners have pointed to no specific statutory provision or legislative history indicating a specific congressional intention to overturn the longstanding *Keogh* construction;[27] harmony with the general legislative purpose is inadequate for that formidable task.

Petitioners' reliance on *Carnation Co.* v. *Pacific Westbound Conference,* 383 U. S. 213 (1966), is also unavailing. In *Carnation,* a shipper of evaporated milk brought an antitrust treble-damages action against an association of shipping companies that had established higher rates for transportation between the west coast of the United States and the Philippine Islands. The defendants contended that the Shipping Act of 1916 had repealed all antitrust regulation of rate-making activities in the shipping industry. Section 15 of the Shipping Act did create an express exemption for collective

H. R. Rep. No. 96–1069, pp. 27–28 (1980); 126 Cong. Rec. 7777 (1980) (statement of Sen. Cannon).

[26] See *Cannon* v. *University of Chicago,* 441 U. S. 677, 696–697 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law"). See also *Director, OWCP* v. *Perini North River Associates,* 459 U. S. 297, 319 (1983); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran,* 456 U. S. 353, 379 (1982); *Albernaz* v. *United States,* 450 U. S. 333, 341 (1981).

[27] The Motor Carrier Act did change the terms of the Reed-Bulwinkle Act in significant respects, see *ICC* v. *American Trucking Assns., Inc.,* 467 U. S., at 356–357, but it did not address the *Keogh* rule. For the same reasons that the creation of the Reed-Bulwinkle exemption did not affect *Keogh,* the reworking of that exemption in the Motor Carrier Act also did not affect the rule of that case.

ratemaking pursuant to agreements that had been approved by the Federal Maritime Commission, but the defendants had not obtained any such approval. They nevertheless contended that the structure of the entire Shipping Act, read against its legislative history, demonstrated an intent to free the ratemaking activities of the shipping industry from the antitrust laws. The Court unanimously rejected the argument, explaining:

> "We recently said: 'Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions.' *United States* v. *Philadelphia National Bank*, 374 U. S. 321, 350–351. We have long recognized that the antitrust laws represent a fundamental national economic policy and have therefore concluded that we cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry. We have, therefore, declined to construe special industry regulations as an implied repeal of the antitrust laws even when the regulatory statute did not contain an accommodation provision such as the exemption provisions of the Shipping and Agricultural Acts. See, *e. g.*, *United States* v. *Philadelphia National Bank*, *supra*." *Id.*, at 217–218.

Petitioners correctly point out that cases like *Carnation* make it clear that collective ratemaking activities are not immunized from antitrust scrutiny simply because they occur in a regulated industry, and that exemptions from the antitrust laws are strictly construed and strongly disfavored. Nevertheless, even if we agreed that *Keogh* should be viewed as an "antitrust immunity" case, we would not conclude that later cases emphasizing the necessity to strictly construe such immunity rendered *Keogh* invalid. For *Keogh* repre-

sents a longstanding statutory construction that Congress has consistently refused to disturb, even when revisiting this specific area of law.

We disagree, however, with petitioners' view that the issue in *Keogh* and in this case is properly characterized as an "immunity" question. The alleged collective activities of the defendants in both cases were subject to scrutiny under the antitrust laws by the Government and to possible criminal sanctions or equitable relief. *Keogh* simply held that an award of treble damages is not an available remedy for a private shipper claiming that the rate submitted to, and approved by, the ICC was the product of an antitrust violation. Such a holding is far different from the creation of an antitrust immunity,[28] and makes the challenge to *Keogh*'s role in the settled law of this area still more doubtful.[29]

---

[28] In so characterizing the issue, we do not minimize the powerful role of the private treble-damages action in the structure of the Nation's antitrust laws. See, *e. g.*, *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 635 (1985) ("The treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators"). Granting this role its due respect, however, a critical distinction remains between an absolute immunity from *all* antitrust scrutiny and a far more limited nonavailability of the private treble-damages remedy. The consent decree in this case, n. 1, *supra*, as well as the unchallenged Court of Appeals decision to remand on the question of injunctive and declaratory relief for antitrust violations highlight this distinction: respondents' conduct has consistently been within the reach of the generally applicable antitrust laws.

[29] The specific *Keogh* holding, moreover, was not even implicated in *Carnation Co.* v. *Pacific Westbound Conference*, 383 U. S. 213 (1966), because the ratemaking agreements challenged in that case had not been approved by, or filed with, the Federal Maritime Commission. *Id.*, at 215. Indeed, the Shipping Act gives the Federal Maritime Commission far more limited authority over rates than the Interstate Commerce Act gives the ICC. See 760 F. 2d, at 1363 ("Although the [Federal Maritime Commission] can and does take effects on competition into account in approving conference agreements under 46 U. S. C. § 814, . . . the Shipping Act does not give the Commission any mandate to regulate *rate* competition and, indeed, the

Finally, petitioners point to various developments, discussed by the Court of Appeals, that seem to undermine some of the reasoning in Justice Brandeis' *Keogh* opinion — the development of class actions, which might alleviate the expressed concern about unfair rebates;[30] the emergence of precedents permitting treble-damages remedies even when there is a regulatory remedy available;[31] the greater sophistication in evaluating damages, which might mitigate the expressed fears about the speculative nature of such damages;[32] and the development of procedures in which judicial proceedings can be stayed pending regulatory proceedings.[33] Even if it is true that these developments cast Justice Brandeis' reasons in a different light, however, it is also true that the *Keogh* rule has been an established guidepost at the intersection of the antitrust and interstate commerce statutory regimes for some 6½ decades. The emergence of subsequent procedural and judicial developments does not minimize *Keogh*'s role as an essential element of the settled legal context in which Congress has repeatedly acted in this area.

## IV

The Court of Appeals, in Judge Friendly's characteristically thoughtful and incisive opinion, suggested that, in view

---

statutory scheme was designed to minimize the role of the FMC in this regard").

[30] See *id.*, at 1352 (discussing development of class actions in view of the *Keogh* concern about antitrust litigation operating as a discriminatory rebate).

[31] See *id.*, at 1354 (noting that "[t]he Court has subsequently found that activity could be challenged under the antitrust laws despite the existence of an administrative agency with authority to regulate the activity").

[32] See *id.*, at 1353 ("The Supreme Court has . . . rejected the argument that a plaintiff cannot recover damages it was able to pass on to its customers in the antitrust context").

[33] See *ibid.* (referring to "the many later cases in which the Supreme Court has directed the suspension of judicial proceedings pending the referral of similar issues to the ICC" in view of the *Keogh* concern about the need for the ICC to determine the propriety of a lower rate).

of subsequent developments, this Court might be prepared to overrule *Keogh*.  We conclude, however, that the developments in the six decades since *Keogh* was decided are insufficient to overcome the strong presumption of continued validity that adheres in the judicial interpretation of a statute.[34] As Justice Brandeis himself observed, a decade after his *Keogh* decision, in commenting on the presumption of stability in statutory interpretation: *"Stare decisis* is usually the wise policy because in most matters, it is more important that the applicable rule of law be settled than that it be settled right. . . . This is commonly true, even where the error is a matter of serious concern, provided correction can be had by legislation."[35]  We are especially reluctant to reject this presumption in an area that has seen careful, intense, and sustained congressional attention.  If there is to be an overruling of the *Keogh* rule, it must come from Congress, rather than from this Court.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE MARSHALL, dissenting.

In his opinion for the Court of Appeals, Judge Friendly cogently and comprehensively explained why the reasoning

---

[34] See, *e. g., NLRB* v. *Longshoremen,* 473 U. S. 61, 84 (1985) ("[W]e should follow the normal presumption of *stare decisis* in cases of statutory interpretation"); *Illinois Brick Co.* v. *Illinois,* 431 U. S. 720, 736 (1977) ("[W]e must bear in mind that considerations of *stare decisis* weigh heavily in the area of statutory construction, where Congress is free to change this Court's interpretation of its legislation").  See also Levi, An Introduction to Legal Reasoning, 15 U. Chi. L. Rev. 501, 540 (1948) ("The doctrine of finality for prior decisions setting the course for the interpretation of a statute is not always followed. . . . Nevertheless, the doctrine remains as more than descriptive.  More than any other doctrine in the field of precedent, it has served to limit the freedom of the court.  It marks an essential difference between statutory interpretation on the one hand and case law and constitutional interpretation on the other").

[35] *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 406 (1932) (dissenting).

of *Keogh* v. *Chicago & Northwestern R. Co.*, 260 U. S. 156 (1922), has been rendered obsolete by subsequent developments in the law. He demonstrated that *Keogh* should be overruled, and I am persuaded by his analysis. I therefore dissent.