**FLORIDA MUNICIPAL POWER
AGENCY, Plaintiff,**

v.

**FLORIDA POWER AND LIGHT
COMPANY, Defendant.**

No. 92-35-CIV-ORL-22.

United States District Court,
M.D. Florida,
Orlando Division.

Dec. 16, 1993.

L. Lee William, Jr., Frederick M. Bryant, Moore, Williams, Bryant, Peebles & Gautier, P.A., Tallahassee, FL, Robert A. Jablon, Bonnie S. Blair, Cynthia S. Bogorad, David E. Pomper, Spiegel & McDiarmid, Washington, DC, for plaintiff.

James M. Grippando, Alvin B. Davis, Steel, Hector & Davis, Miami, FL, J.A. Bouknight, Jr., Edward J. Twomey, Steve Ross, Newman & Holtzinger, P.C., Washington, DC, for defendant.

### MEMORANDUM DECISION AND ORDER

CONWAY, District Judge.

This cause comes before the Court on the parties' cross-motions for summary judgment. On May 1, 1992, Plaintiff Florida Municipal Power Agency ("FMPA") filed a Motion for Partial Summary Judgment on Count I of the Amended Complaint (Dkt. 28). On April 15, 1993, Defendant Florida Power and Light Company ("FPL") filed a Motion for Summary Judgment (Dkt. 140), and FMPA filed a Motion for Partial Summary Judgment on Essential Facilities and Transmission Market Issues and on FPL's Waiver and Estoppel Defenses (Dkt. 145). The Court heard oral argument on these motions on November 22, 1993.

Summary judgment is appropriate only when the Court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, the Court must view all of the evidence in a light most favor-

able to the non-moving party. *Samples ex rel. Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988).

The Court finds that the "filed rate" doctrine, as it has evolved through a line of Supreme Court cases, is critical to the disposition of this case. Under the filed rate doctrine, the Federal Energy Regulatory Commission ("FERC") has exclusive authority to determine the reasonableness of wholesale rates for power. This principle binds both state and federal courts. FERC's exclusive jurisdiction applies not only to rates but also to other decisions within the jurisdiction of FERC, such as power allocations, that affect wholesale rates. *Mississippi Power & Light Co. v. Moore,* 487 U.S. 354, 371, 108 S.Ct. 2428, 2438, 101 L.Ed.2d 322 (1988).

## I. *Facts*

FMPA contends that FPL has refused to sell it transmission services on a fair basis, in violation of FPL's contractual obligations as well as federal and state antitrust laws. Except as noted, all facts set forth below are culled from documents filed by FMPA.

### a. *Parties:*

FPL is one of the largest electric utilities in the United States and serves approximately one-half of Florida's electric load. It operates throughout most of Southern and Eastern Florida, and its area of operation extends up the east coast of Florida to the Georgia border. Its area of retail service covers approximately 36 counties, 27,659 square miles, and 700 communities. It serves approximately three million customers. FPL sells electricity both at wholesale to other electric utilities and at retail to ultimate users. FPL provides both high voltage electricity, (i.e., transmission voltage electricity) at the wholesale level to its own and others' distribution systems throughout its area of operation, and low voltage electricity (i.e., subtransmission and distribution voltage electricity) directly to retail customers throughout a large portion of its area of operation.

FMPA is a municipally-owned agency, established pursuant to state law. It sells electricity and performs other services for its member, municipally-owned electric utilities. Throughout Florida there are many cities which own and operate electric systems for the benefit of their residents. FMPA was established to enable these cities to buy affordable and reliable electricity, using FMPA's ability to finance, negotiate for power supply and coordinate resources. FMPA's members compete with FPL in the provision of low voltage electricity to consumers, and FMPA and FMPA members compete or attempt to compete with FPL in the provision of high voltage electricity to certain distribution systems and to other utilities.

### b. *Transmission Service:*

There are three basic functions, or levels of production, in the sale of electricity: generation, transmission and distribution. All three functions are necessary for delivery of electricity to ultimate consumers. A vertically integrated utility, such as FPL, performs all three functions. Other entities in the electric utility industry may perform only one or two. FMPA, for example, engages in the generation of electricity and in purchases and sales of bulk power or electricity at the wholesale level. All of FMPA's member cities engage in distribution of electricity to retail customers, and some of FMPA's members also generate electricity. However, because many of FMPA's power supply resources and many of its member cities are located within the FPL-owned transmission area, FMPA and its members must depend upon FPL for transmission services.

Transmission is necessary for virtually every purchase and sale transaction among utilities, as well as for delivering electricity efficiently to ultimate consumers. Transmission over the FPL network involves the receipt of a quantity of electricity by the FPL network at one or more locations coupled with delivery of a like quantity of electricity from the FPL network at one or more other locations. FPL currently sells transmission to FMPA on a "point-to-point" basis. Under this system, FPL assesses a charge for

transmission between pairs of FMPA receipt and delivery points (points at which electricity would be delivered to and/or from the FPL network). With limited qualifications, FMPA typically has rights to transmission only between one designated resource and one city. If it desires to supply this city from another power source, it must pay a separate duplicative transmission charge.

By contrast, FPL uses a transmission network to integrate its generation and purchased power resources. As the level of electricity use changes during the day (and during various time periods within a year), FPL uses electricity from different power supply sources to have the optimal electricity mix to serve its customers' electricity needs at a reasonable price. FPL uses its transmission system to integrate its power supply resources located throughout Florida with additional power supply from Georgia and power which is purchased from other utilities.

FMPA wants to be able to purchase transmission services on FPL's transmission network to integrate FMPA's resources in the same way. Specifically, FMPA has requested access to the FPL-owned transmission network for FMPA's Integrated Dispatch and Operations project ("IDO"). Through this project, FMPA and its members hope to obtain savings from jointly planning and operating their power supply resources. Access to a transmission network would enable them to operate their available resources more efficiently, obtain economies in power supply planning and purchasing, and be better able to plan for new generation and power supply resources. FMPA does not want to be restricted to buying transmission services on a "point-to-point" basis which limits FMPA to transmission between specific delivery and receipt points. An effort to "network" with "point-to-point" charges in effect would result in multiple transmission charges. Because FPL has refused to sell FMPA transmission on a network basis, FMPA cannot implement its IDO project.

*c. History of the Case:*

During the 1970s and early 1980s, a number of Florida cities that are now FMPA members brought legal actions against FPL, which included the filing of antitrust and other claims in the Southern District of Florida, and petitions and interventions before the Atomic Energy Commission and its successor, the Nuclear Regulatory Commission ("NRC"). During this time, FPL was seeking approval for its St. Lucie Unit 2 nuclear plant. In proceedings before the NRC, the Department of Justice ("DOJ") and the staff of the NRC, as well as the Florida cities, attempted to attach antitrust conditions to the St. Lucie Plant Unit 2 nuclear license.

The antitrust issues raised by DOJ and the NRC staff were resolved in an amendment to the construction permit which was issued to FPL on May 26, 1981. The permit, in a section identified as Article X, "Transmission Services," sets forth the antitrust conditions to which FPL agreed. The parties refer to this section as either the "Antitrust Conditions" or the "License Conditions".[1] Thereafter, FPL entered into settlement agreements with various cities that had brought legal actions against FPL. These settlement agreements are detailed in paragraph 15 of FMPA's Amended Complaint.

As set forth above, FPL is currently selling FMPA "point to point" transmission service. This service is rendered pursuant to five existing transmission service agreements ("TSAs") between FPL and FMPA: 1) the St. Lucie Delivery Service Agreement dated June 27, 1983; 2) the Stanton Transmission Agreement dated November 25, 1986; 3) the Stanton Tri–City Transmission Agreement dated November 25, 1986; 4) the Restated and Revised Transmission Service Agreement; and 5) the Agreement to Provide Specified Transmission Service dated April 24, 1986. The TSAs have been filed with FERC.

In 1989 FMPA began negotiating for transmission network service. The negotiations were unsuccessful. FMPA then filed this suit in state court on December 13, 1991.

---

1. FPL asserts that the License Conditions are simply a part of a construction permit granted by the NRC that neither FMPA or FPL signed.

FPL's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment (Dkt. 34), p. 7.

FPL removed the case to federal court on January 13, 1992. FMPA's Amended Complaint (Dkt. 14), filed on February 13, 1992, contains three counts. In Count I, FMPA asserts that the various settlement agreements to which FPL was a party and the construction permit, collectively, constitute a contract between FMPA and FPL, which contract FPL breached by refusing to sell FMPA the transmission service the latter sought. In Count II, FMPA claims that FPL violated state antitrust laws. Federal antitrust violations are alleged in Count III. Under all three counts, FMPA seeks injunctive relief and damages.

## II. *Analysis*

### a. *The Filed Rate Doctrine:*

The boundaries of the filed rate doctrine have been established by various Supreme Court cases. The doctrine was first applied in *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). In *Keogh*, a shipper brought suit under Section 7 of the Antitrust Act against eight railroad companies and twelve individual defendants. The shipper alleged that the defendants had entered into an agreement through which the rates for shipping goods from St. Paul, Minnesota were set, that the rates which were set were higher than those in existence before the agreement, that the higher rates were arbitrary and unreasonable and that the agreement eliminated competition. Assuming that, but for the conspiracy, the lower rates would have remained in effect, the shipper sought 1) damages based on the difference in rates, and 2) damages based on the decrease in value of his factory through loss of profits.

The Court noted that the rates contained in the agreement had been approved by the Interstate Commerce Commission ("ICC"). This approval established that the rates were reasonable but did not preclude the possibility that an antitrust violation had occurred. Arguably, lower rates would also have been within the zone of reasonableness and the imposition of the higher rates set in violation of the Antitrust Act could result in an injury.

The Court rejected this proposition. It reasoned that the ICC's approval of the higher rate had established the rate as lawful and that the legal rights of a shipper are set by the approved rate. Since the shipper had paid no more than the legal rate, he had not been "injured in his business or property" and therefore could not maintain an action for damages under Section 7 of the Antitrust Act.

The Court went on to identify two additional obstacles to the relief sought by the shipper. First, the plaintiff would have to prove at trial that the hypothetical lower rate would have conformed to the requirements of the federal statute regulating commerce. However, such a determination would have to be made by the ICC. Since no mechanism could ever exist for seeking review by the ICC of a hypothetical rate, plaintiff would be unable to meet his burden at trial. Second, the Court found that the damages sought were purely speculative. In the end, since the plaintiff was not entitled to any rate other than the legal rate approved by the ICC, he could not maintain a claim for treble damages based on a lower rate under Section 7 of the Antitrust Act.

The filed rate doctrine was first applied to industries regulated by the Federal Power Act in *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951). In *Montana–Dakota*, two electric utility companies with interlocking directorates and joint officers interchanged electrical energy based on rates filed with and accepted by the Federal Power Commission (the "FPC").[2] A successor to one of the companies, petitioner Montana–Dakota Utilities Co., subsequently filed suit, alleging that under the approved rates it had paid unreasonably high prices for the electrical energy it received from the other company and had also received unreasonably low rates for electrical energy it provided. These unreasonable prices were allegedly unlawful and fraudulent. The interlocking directorate not only created the unreasonable rates but also prevented protest by petitioner to the FPC. Petitioner

**2.** On October 1, 1977, the responsibilities of the FPC were transferred to FERC. *Arkansas Loui-*

*siana Gas Co. v. Hall*, 453 U.S. 571, 574 n. 3, 101 S.Ct. 2925, 2928 n. 3, 69 L.Ed.2d 856 (1981).

sought damages for the unreasonable rates it had paid over a ten-year period. To support its claim, petitioner argued that under the Federal Power Act, it had a legal right to a reasonable rate and that a court may determine that a rate is reasonable even if a different rate had been accepted by the FPC.

■ The Court rejected Petitioner's assertion that a court could determine what a reasonable rate during the past should have been.

> Petitioner cannot separate what Congress has joined together. It cannot litigate in a judicial forum its general right to a reasonable rate, ignoring the qualification that it shall be made specific only by exercise of the Commission's judgment, in which there is some considerable element of discretion. It can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms.

> We hold that the right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable.

*Id.* at 251–52, 71 S.Ct. at 695–95. Hence, the role of a court in a case challenging a rate is limited to review of an agency decision. A court may not make an initial determination regarding the reasonableness of the rate, and may not, after the fact, determine that an approved rate was unreasonable. In so holding, the Court recognized that the petitioner was left without a remedy under the Federal Power Act. Under *Montana–Dakota*, then, it is clear that the filed rate doctrine pertains to both fraud and antitrust claims, and applies to electric utilities subject to the Federal Power Act, as well as to carriers subject to federal statutes regulating commerce.

■ Although *Keogh* and *Montana–Dakota* addressed the right to damages claimed by a purchaser of regulated services, the filed rate doctrine also applies to a seller's claim for damages. In *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (*"Arkla"*), producers and sellers of natural gas ("respondents") entered into a contract with one of their customers ("petitioner"). The contract contained a "favored nations clause" which provided that if petitioner purchased gas from another party at a rate higher than the rate it was paying to respondents, then respondents would be entitled to a higher price for their sales to petitioner. The contract was then filed with the FPC.

Petitioner later entered into a lease agreement and began producing gas on its leasehold without informing respondents. Once respondents became aware of the lease, they filed suit for breach of contract in state court. The trial court found that the lease payments had triggered the favored nations clause. Respondents, therefore, were entitled to a higher rate at the time petitioner entered into the lease. However, respondents failed to file the higher rate with the FPC in a timely fashion because they were unaware of the existence of the lease.

The question before the Court in *Arkla* was whether the filed rate doctrine would forbid an award of damages for breach of contract. Petitioner argued that such an award would constitute a retroactive rate increase based on speculation about what the FPC might have done had it been faced with the facts of the case. The Court noted that any award of damages would require an assumption that the higher rate that might have been filed was reasonable. The Court then stated, "[b]ut under the filed rate doctrine, the Commission alone is empowered to make that judgment, and until it has done so, no rate other than the one on file may be charged." *Id.* at 580–81, 101 S.Ct. at 2932. Therefore, the filed rate doctrine precluded an award of damages for petitioner's breach.

The tension between the conflicting policies supporting the antitrust laws and the statutes regulating interstate commerce first addressed in *Keogh* was once against considered by the Court in *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). In *Square D,* petitioner shippers alleged that the rates filed with the ICC by respondent motor carriers were fixed pursuant to an

agreement that violated antitrust laws. The petitioners sought treble damages and injunctive relief. The court of appeals affirmed the district court's dismissal of the claim for treble damages, but remanded the case "for a further hearing to determine whether petitioners are entitled to injunctive relief and to give them an opportunity to amend their complaints to state possible claims for damages not arising from the filed tariffs." *Id.* at 414, 106 S.Ct. 1925.

The Court in *Square D* rejected petitioners' argument that *Keogh* should be overruled. The Court noted that "Keogh represents a longstanding statutory construction that Congress has consistently refused to disturb, even when revisiting this specific area of law." *Id.* at 421–22, 106 S.Ct. 1929. The Court was not persuaded that the unavailability of treble damages in a private action left petitioners without a remedy for antitrust violations. Injunctive relief was still available. *Id.* at 422 n. 28, 106 S.Ct. 1929 n. 28. Within the last decade, then, the Court has reaffirmed the vitality of the filed rate doctrine in the antitrust context.

Less than a month after the Court rendered its opinion in *Square D*, it once again applied the filed rate doctrine to a case involving power utilities. In *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986), the appellants were two wholly-owned subsidiaries and their parent corporation. Each of the subsidiaries owned a hydroelectric plant which produced a variable quantity of power. The power produced went to the Tennessee Valley Authority ("TVA"). In exchange, the two subsidiaries received low-cost "entitlement power" from TVA. Additionally, one of the subsidiaries, Nantahala Power & Light Co., bought a variable amount of high-cost "purchased power."

FERC approved an allocation of entitlement and purchased power between the two subsidiaries. Later, in the course of calculating a rate to be charged Nantahala's retail customers, the Utilities Commission of North Carolina ("NCUC") chose an allocation of entitlement and purchased power that differed from the allocation approved by FERC. NCUC determined that Nantahala was enti-

tled to a higher allocation of low-cost power and set retail rates for customers based on a lower average cost of wholesale power to Nantahala. The North Carolina Court of Appeals and the North Carolina Supreme Court affirmed NCUC's decision.

Appellants argued that NCUC's decision was inconsistent with the filed rate doctrine, "which in pertinent part holds that interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates." *Id.* at 962, 106 S.Ct. at 2354. The doctrine applies to both federal court and state court scrutiny of FERC decisions. As it relates to federal court review, the doctrine is a "rule of administrative law designed to ensure that federal courts respect the decisions of federal administrative agencies." *Id.* at 963, 106 S.Ct. at 2355. When applied to state court review, the doctrine serves to enforce the Supremacy Clause.

After reviewing *Montana–Dakota, Arkla* and several other cases discussing the filed rate doctrine, the Court noted that "[t]hese decisions are properly driven by the need to enforce the exclusive jurisdiction vested by Congress in FERC over the regulation of interstate wholesale utility rates." *Id.* at 966, 106 S.Ct. at 2356. It went on to say:

> Moreover, the filed rate doctrine is not limited to 'rates' *per se:* 'our inquiry is not at an end because the orders do not deal in terms of prices or volumes of purchases.' Here FERC's decision directly affects Nantahala's wholesale rates by determining the amount of low-cost power that it may obtain, and FERC required Nantahala's wholesale rate to be filed in accordance with that allocation. FERC's allocation of entitlement power is therefore presumptively entitled to more than the negligible weight given it by NCUC.

*Id.* at 966–67, 106 S.Ct. at 2356–57 (citation omitted). Therefore, under the filed rate doctrine, a state utility commission may not approve an allocation of power that differs from the allocation approved by FERC when FERC's allocation indirectly affects wholesale rates. *See also Mississippi Power &*

*Light Co. v. Moore,* 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) (proceedings by a state utility commission to determine the prudence of costs incurred in connection with a nuclear power plant and the reasonableness of FERC's cost allocation were preempted by federal law).

b. *Availability of Damages:*

■ According to FPL, this case involves "a dispute over the pricing of electrical transmission." FPL's Memorandum of Law in support of Its Motion for Summary Judgment, (Dkt. 141), p. 1. FPL characterizes FMPA's desire for a single "network" charge as an assertion that FMPA should pay the same charge to send power between any two points on the FPL system as FMPA currently pays (at FERC-approved rates) for sending an equivalent amount of power between two pre-designated points on FPL's transmission system. FPL's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment (Dkt. 34), p. 4 n. 3. FMPA counters by reasserting that the real issue is what services FPL will sell. According to FMPA, "FPL's existing rate schedules do not provide for transmission connecting each IDO resource to each IDO member city, at *any* price." FMPA's Memorandum in Opposition to FPL's Motion for Summary Judgment, (Dkt. 149), p. 16.

Review of documents filed by FMPA and representations made at the hearing on pending motions sheds some light on the true nature of FMPA's damage claim. In Count 1 of the Amended Complaint, FMPA alleges that FPL has breached a contract "[b]y requiring [some FMPA members] to pay multiple times for the same use of FPL's transmission facilities" and "[b]y not offering FMPA reasonable terms and conditions for transmission service." Amended Complaint, (Dkt. 14), page 10. One of the most basic terms to be negotiated in any service agreement is price, or in the realm of electric utilities, rate. In its antitrust claims, FMPA also refers to paying multiple charges and to the need for reasonable terms and conditions. *Id.* at pages 17, 21 and 24. This language suggests that a "reasonable" cost for transmission network service, *i.e.,* a reasonable

rate, is an integral part of the remedy FMPA seeks.

The connection between cost and service was underscored at the hearing on pending motions. The Court inquired whether FMPA could, under the existing TSAs, obtain all the transmission service it sought. Counsel for FMPA responded that the transmission service was available, but that the charges that would be assessed pursuant to the existing TSAs would make the network alternative impracticable. FMPA's position, therefore, is that under the rates currently on file with FERC, a transmission network service would be prohibitively expensive. From this position, FMPA then could argue that a prohibitively expensive service is, in effect, a service that has been denied. However, the fact that a service is prohibitively expensive may also suggest that the rate charged is unreasonable. Therefore, FMPA's representation that at this time transmission network service is impracticable is fairly construed as an assertion that the rates on file are unreasonable.

One of the affidavits filed by FMPA's expert on damages, Albert B. Malmsjo, also provides insight into the nature of FMPA's damage claim. FMPA's Memorandum in Opposition to Florida Power & Light's Motion for Partial Summary Judgment (Dkt. 149), Appendix E. Mr. Malmsjo's affidavit provides in relevant part:

To quantify FMPA's damages, I have simply subtracted FMPA's costs of operating with IDO in place from the higher costs necessary to conduct its business without being able to achieve the economies expected from IDO.... For the 'with IDO' scenario, the resource planning and transmission was determined assuming that FPL was willing to allow flexible use of that transmission, to deliver electricity for a single charge among the various receipt and delivery points at which FMPA's generating resources and the FMPA member cities are connected to the FPL network.... The model ... assumes that with IDO, FMPA would continue to pay FPL for transmission, at the same historical and projected price per unit of electricity transmitted that FPL now charges

FMPA under FERC-filed transmission rates....

From a review of FMPA's materials and statements, then, it is clear that the cost of transmission based on a network system is a crucial component of all of FMPA's claims. Since FMPA could have obtained the service it sought at any time, its claim for damages reduces to a claim that the rate for transmission on file with FERC was unreasonable. FMPA would be entitled to a different rate prospectively if it were to prevail on its contract or antitrust claims. However, a claim for damages is another matter. Such a claim would be based on the premise that FPL could have, and should have, made transmission service available on terms different than those on file with FERC. This premise surfaces in the assumptions underlying the "with IDO" costs for the damage calculations by FMPA's expert. Mr. Malmsjo assumed that "with IDO" the rate currently on file with FERC would remain the same, even though the transmission service available at that rate would be altered and, arguably, expanded. It is just as plausible to assume that the altered (or expanded) service that FMPA seeks would have been made available at a somewhat higher rate, even if the current rate/service structure (that FMPA asserts is prohibitively costly) were disallowed.

█ The Supreme Court's filed rate doctrine decisions are clearly applicable to FMPA's damages claim. Under *Keogh*, FMPA can claim no right to a rate other than the legal rate that was approved by FERC. FMPA sidesteps this principle by asserting that the past rate on which it bases its damage calculations is the same as the current filed rate. But when FERC approves or fixes a given rate, that rate is established as reasonable for the service rendered. If the service is altered, a new determination regarding rate must be made. Whether the same rate is reasonable for an altered service or whether a higher rate is required is a determination within the exclusive jurisdiction of FERC. According to *Montana–Dakota*, a court cannot determine what a reasonable rate during the past would have been. As the Supreme Court in *Keogh* observed, there is no mechanism available for review by a regulatory commission of a hypothetical rate. At trial, FMPA would not be able to establish that the rate on which it bases its damage calculations would have been reasonable in the eyes of FERC.

FMPA has asserted that the damages it claims are consequential damages for the business effects of FPL's refusal to offer a transmission network service. FMPA's Memorandum in Opposition to FPL's Motion for Summary Judgment (Dkt. 149), p. 18. In *Square D*, the court of appeals initially remanded the case for a hearing to determine whether the injured party was entitled to amend the complaint to state possible claims for damages not arising from the filed rates. It may be that FMPA is similarly attempting to assert a claim for damages in terms that do not implicate the rates on file with FERC. However, in *Arkla*, the Court stated that any award of damages would require an assumption that the higher rate that might have been filed was reasonable, but only FERC could make that determination. In the case at bar, any award of damages would require an assumption regarding what type of rate/service terms would have been approved by FERC. The Court cannot engage in this type of speculation. FMPA's claim for damages is prohibited by the filed rate doctrine.

The Court has reviewed all of the lower court cases cited by the parties and finds that the cases cited by FMPA are not applicable under Eleventh Circuit and Supreme Court precedent or are factually distinguishable.

## c. The Availability of Injunctive Relief

█ Although the filed rate doctrine may prohibit an award of damages, it does not eliminate the possibility of injunctive relief.

█ In *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), the Supreme Court upheld a decree which in relevant part enjoined an electric utility company from refusing to sell electric power at wholesale to existing or proposed municipal electric power systems. The Court determined that the Federal Power Act did not override antitrust concerns. Additionally, the Court found that the dis-

trict court's decree did not conflict with existing FPC orders. Therefore, injunctive relief from antitrust violations is available. *See also Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 419, 422 n. 28, 106 S.Ct. 1922, 1928, 1930 n. 28, 90 L.Ed.2d 413 (1986) (although treble damages were unavailable in antitrust actions, tariff-related claims were nonetheless subject to governmental and injunctive antitrust actions).

■ Although FMPA would ordinarily be entitled to pursue injunctive relief before this Court, such relief appears to have been mooted by action recently taken by FERC. On July 2, 1993, FMPA filed a complaint with FERC. In its complaint, FMPA requested the Commission to direct FPL to provide network transmission service without assessing multiple charges for each receipt or delivery point. On October 28, 1993, FERC issued its "Order Noting and Granting Interventions; Proposed Order Directing Network Transmission Services; And Establishing Further Procedures." *See* Dkt. 232. In the press release accompanying its order/proposed order, FERC stated that FMPA's request has been granted. However, the Federal Power Act requires that the Commission first issue a proposed order and allow the parties sufficient time for negotiation before a final order is issued. If the parties are not successful in their negotiations, the Commission will set the rates, terms and conditions of network service.

It appeared to the Court that FERC's proposed order resolved the issues presented in this case. However, at the hearing on pending motions, counsel for FMPA represented that the issue of damages was not resolved by FERC. As set forth above, FMPA's claim for damages is prohibited by the filed rate doctrine.

FMPA has already received directly from FERC the relief it sought through injunction in this case. Additionally, application of the filed rate doctrine requires dismissal of FMPA's damage claims.

Accordingly, it is hereby ORDERED:

1. Defendant Florida Power and Light Company's Motion for Summary Judgment (Dkt. 140), filed April 15, 1993, is GRANTED in part and DENIED in part.

   a. To the extent FPL has argued that FMPA's claim for damages is prohibited by the filed rate doctrine, the motion is GRANTED.

   b. In all other respects, the motion is DENIED as moot.

2. Plaintiff Florida Municipal Power Agency's Motion for Partial Summary Judgment on Count I of the Amended Complaint (Dkt. 28), filed May 1, 1992, is DENIED as moot.

3. Plaintiff Florida Municipal Power Agency's Motion for Partial Summary Judgment on Essential Facilities and Transmission Market Issues and on Florida Power & Light's Waiver and Estoppel Defenses (Dkt. 145), filed April 15, 1993, is DENIED as moot.

4. All other pending motions are DENIED as moot.

5. This case is DISMISSED.

DONE AND ORDERED.