**In re ENRON CORP., et al., Reorganized Debtors.**

**No. 01–16034 (AJG).**

United States Bankruptcy Court, S.D. New York.

Aug. 5, 2005.

Cadwalader, Wickersham & Taft LLP, Edward A. Smith, of Counsel, New York City, Mark C. Ellenberg, of Counsel, Washington, DC, for the Reorganized Debtors.

Lieff, Cabraser, Heimann & Bernstein, LLP, Wendy R. Fleishman, of Counsel, New York City, William Bernstein, Barry R. Himmelstein, Karin Kramer, of Counsel, San Francisco, CA, for Oscar's Photo Lab.

**OPINION SUSTAINING DEBTORS' OBJECTION TO PROOFS OF CLAIM NO. 15229–35 FILED BY OSCAR'S PHOTO LAB AND MOTION TO AMEND CERTAIN PROOFS OF CLAIM FILED BY OSCAR'S PHOTO LAB**

ARTHUR J. GONZALEZ, Bankruptcy Judge.

In August 2002, the Federal Energy Regulatory Commission ("FERC") issued

the Initial Report on Price Manipulation in Western Markets: Fact–Finding Investigation of Potential Manipulation of Electric and Natural Gas Price ("Initial Report"). On October 15, 2002, Oscar's Photo Lab ("OPL") filed separate proofs of claims (Claim Nos. 15229–35, collectively, the "Claims") in unliquidated amounts against Enron Corp. ("Enron") and certain of its affiliated entities (collectively, the "Debtors"). OPL alleges that the Debtors manipulated the wholesale electricity market in California and overcharged for energy through unlawful and anti-competitive acts during the western power crisis of 2000 and 2001. OPL maintains the alleged manipulation in the wholesale electricity market constitutes a violation of state antitrust law and unfair competition law, and seeks disgorgement, restitution, actual and treble damages together with interest and injunctive relief.[1] In March 2003, FERC issued the Final Report on Price Manipulation in Western Markets: Fact–Finding Investigation of Potential Manipulation of Electric and Natural Gas Price ("Final Report"). In September 2003, OPL filed Partial Objection of Claimant OPL to Motion of Enron Corp., et al. for Order Establishing Procedures to Estimate Disputed, Unliquidated, or Contingent Claims (the "Partial Objection"). In footnote 2 of the Partial Objection, OPL asserts that the miscon-

duct relating to the natural gas trading platform is at issue in determining the Debtors' liability to California ratepayers under the timely-filed original Claims. On February 1, 2005, the Debtors filed objections to the Claims and argued that the Federal Power Act (the "FPA") preempts the Claims and the filed rate doctrine precludes consideration of them.

On March 16, 2005, OPL filed the motion to amend proofs of claim (Claim Nos. 15231–33),[2] to include a cause of action based on the Debtors' alleged manipulation of the California natural gas market. (collectively, the "Gas Claims"). On April 11, 2005, the Debtors filed its objection the relief sought by OPL.[3]

The issues before the Court are (1) whether the Claims are preempted by the Federal Power Act (the "FPA") and precluded by the filed rate doctrine, (2) whether OPL may amend the Claims to include additional claims concerning the alleged manipulation of California's gas market. Upon consideration of the pleadings and arguments of the parties, the Court finds that because the FERC has exclusive jurisdiction over interstate sales of wholesale electricity, the Claims sought to be enforced by OPL are preempted by the FPA. Further, the filed rate doctrine also precludes consideration of the Claims. In addition, the Court finds that OPL's

---

1. California Unfair Competition Law, Business & Professional Code § 17200. OPL alleges that the Debtors' violation of Business & Professional Code § 17200's proscription against engaging in unlawful business acts and practices.

2. OPL filed the motion to amend its original proofs of claim against Enron North America Corp. (Claim No. 15231), Enron Corp. (Claim No. 15232), and Enron Energy Services, Inc (Claim No. 15233) based on their alleged manipulation of the natural gas market in California. Because OPL did not file the amendment against Enron Energy Marketing Corp.

(Claim No. 15229), Enron Power Marketing Inc. (Claim No. 15230), Enron Energy Services, LLC (Claim No. 15234) and Enron Energy Services North American, Inc (Claim No. 15235), it is presumed that these entities did not involve the gas market manipulation.

3. The Debtors responded to the relief sought by OPL as if it included a request for leave to file late proofs of claim. However, since OPL neither briefed nor argued such a request, the Court only addresses the relief sought as a request to amend OPL's timely-filed original Claims.

request to amend its original proofs of claim against the Debtors is not warranted since OPL has failed to meet the standard for a motion to amend. In that, it has included new claims or created new causes of action in its request, and the amendment was not timely asserted. Therefore, the Court sustains the Debtors' objection to the Claims and the Debtors' objection to the motion to amend. Further, the Court finds that even if the amendment regarding the Gas Claims were granted, the filed rate doctrine would preclude the Court from considering such claims.

## I. BACKGROUND

Commencing on December 2, 2001, and from time to time continuing thereafter, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On July 15, 2004, the Court entered an Order confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases. The Plan became effective on November 17, 2004.

This litigation arises out of the California energy crisis of 2000–01. Prior to the energy crisis, the California legislature had passed Assembly Bill 1890[4] (the "Bill") to create two non-governmental entities, the California Power Exchange (the "PX") and the California Independent System Operator (the "ISO"), to operate markets and manage the sale of electricity. The PX and the ISO were organized under California law, but regulated by FERC. *California v. Dynegy, Inc.*, 375 F.3d 831, 850 (9th Cir.2004). The central transactions, wholesale sales of energy in inter-

state commerce, were governed by FERC approved rules and a FERC "jurisdictional" ISO and PX. Further, the centralized wholesale spot electricity markets operated by the ISO and the PX were established subject to FERC review and approval. The ISO and the PX served as clearinghouses. Since August 2, 2000, FERC has commenced refund proceeding, and partnership and gaming proceeding to investigate certain of the Debtors. FERC found that the Debtors engaged in gaming[5] in the form of inappropriate trading strategies and further engaged in the deliberate submission of false information or the deliberate omission of material information. *Enron Power Mktg., Inc., et al.*, 106 FERC ¶ 61,024 (2004). Both proceedings are ongoing, including the determination of remedies by FERC.

## II. DISCUSSION

### 1. Preemption and Filed Rate Doctrine

#### A. Legal Standard of Preemption

■ "Federal preemption of state law is rooted in the Supremacy Clause, Article VI, clause 2, of the United States Constitution." *Transmission Agency of Cal. v. Sierra Pacific Power Co.*, 295 F.3d 918, 928 (9th Cir.2002). Where Congress manifests intent to occupy an entire regulatory field, any remedy sought outside of the congressional scheme is considered completely preempted. *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 63–64 (1987). Federal courts have rarely identified legislation that has been found to completely preempt state jurisdiction. *Caterpillar, Inc. v.*

---

**4.** 1996 Cal. Stat. 854.

**5.** The ISO tariff, through the ISO's Market Monitoring and Information Protocol defines gaming, in part, as "taking unfair advantage of the rules and procedures set forth in the PX

or the ISO tariffs, Protocols or Activity Rule ... to the detriment of the efficiency of, and of consumers in, the ISO markets." *Am. Electric Power Service Corp., et al.*, 103 FERC ¶ 61,346 (2003).

*Williams*, 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987).

■ Here, neither party raises the argument that complete preemption is applicable, nor is there any evidence in the record that would support the conclusion that Congress intended for complete preemption to apply in this case. In the absence of an express preemption by Congress, state law is preempted (1) "when Congress intends that federal law occupy a given field." *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) ("Field Preemption"), and (2) "to the extent that state law actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* ("Conflict Preemption").

*B. Preemption*

1) Field Preemption

■ The Debtors, in support of their position that the Claims should be barred by FERC's exclusive jurisdiction, cite to *Grays Harbor v. IDACOR Inc.*, 379 F.3d 641 (9th Cir.2004), *Dynegy*, and *Snohomish County v. Dynegy Power Marketing Inc.*, 384 F.3d 756 (9th Cir.2004). These cases addressed FERC's exclusive jurisdiction and its remedial power concerning the wholesale electricity market. The Debtors argue that the Claims, alleging violations of state antitrust and unfair competition law, are nearly identical to those involved in the cited cases, therefore, for the reasons set forth in those cases, field preemption is applicable here.

The *Dynegy* court ruled that "state actions against wholesale electricity suppliers alleging violations of California's unfair business practices law are preempted by FPA because the conduct the state sought to condemn was expressly governed by the ISO tariffs and they encroach upon the substantive provisions of the tariff, an area reserved exclusively to FERC, both to enforce and to seek remedy." 375 F.3d at 852.

The Court finds that the statute's framework under the FPA supports the conclusion in *Dynegy* that FERC has been granted broad authority by Congress, in addition to the authority to determine the "just and reasonable rates" for wholesale power. The statute delegates to the Federal Energy Commission "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce except those which Congress has made explicitly subject to regulation by the states.... Retail sales of electricity and wholesale intrastate sales are within the exclusive jurisdiction of the states." Federal Power Act, 16 U.S.C. § 824–824m.

Neither party disputes that the transactions at issue involved wholesale interstate sales of electricity. Further, there has been no evidence presented or any representation by either party that the sales that gave rise to this dispute should be characterized as either retail sales of electricity or wholesale intrastate sales. The statute provides that upon a determination by FERC that "any rate charge, or classification, demanded, observed, charged, or collected by any public utility for any *transmission or sale* subject to the jurisdiction of the Commission, or that any rule, regulation, *practice, or contract affecting such rate, charge, or classification* is unjust, unreasonable, unduly discriminatory or preferential, *the Commission shall determine* the just and reasonable rate, charge, classification, rule, regulation, *practice*, or contract to be thereafter observed and in force, and shall fix the same

by order." Federal Power Act, 16 U.S.C. § 824e (emphasis added).

Moreover, pursuant to the statute, FERC possesses broad remedial authority to address anti-competitive behavior, specifically through profit disgorgement and refunds. Further, FERC can proceed by rulemaking rather than case-by-case adjudication, and can rely on general findings of systemic monopoly conditions and the resulting potential for anti-competitive behavior, rather than evidence of monopoly and undue discrimination on the part of individual utilities. Federal Power Act, 205, 206(a), as amended, 16 U.S.C.A. 824d, 824e; Department of Energy Organization Act, 403(c), 42 U.S.C.A. 7173(c).

In addition, after the deregulation of California energy markets, the central transactions and the wholesale sales of energy in interstate commerce were governed by FERC approved rules and a FERC "jurisdictional" ISO and PX. Having examined FERC's regulatory authority over the deregulated electricity market in California, the *Snohomish* court concluded, "FERC is doing enough regulation to justify federal preemption of state laws under the market-based system of setting wholesale electricity rates." *Snohomish*, 384 F.3d at 760–61. For instance,

(1) FERC continued to oversee wholesale electricity rates by reviewing and approving a variety of documents filed by the PX and the ISO. FERC approved the market-based tariffs only upon a

showing that the seller lacked or had mitigated its market power. (2) FERC required each seller to file quarterly reports under FPA § 205(c) 16 U.S.C. § 824d(c). (3) FERC reviewed and approved detailed tariffs filed by the PX and the ISO, which described in detail how the markets operated by each entity would function. *Id.*

In addition, "[e]ach participant in the PX and the ISO markets was required to sign an agreement acknowledging that the tariff filed by either the PX or the ISO would govern all transactions in that market." *Id.* The Court also recognizes that "entities that transact through the ISO or [the] PX and engage in improper practices[6] are in violation of filed tariffs.... FERC and the Market Surveillance Unit are directed by the ISO's Market Monitoring and Information Protocol to refer matters to the FERC for enforcement." 103 FERC ¶ 61,346.

Moreover, the Court finds that *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), and *California v. Federal Power Commission,* 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962) are not controlling in the instant case. In both cases, the Supreme Court found that Congress does not intend to bar the government from bringing actions in violation of antitrust laws related to filed tariffs before regulatory commissions. However, two important differences exist. First, both cases discussed issues of the

---

6. Since 1998, the ISO and the PX tariffs have contained provisions that identify and prohibit "gaming" and "anomalous market behavior" in the sale of electric power. "Anomalous market behavior" is (1) behavior that departs significantly from the normal behavior in competitive markets that do not require continuing regulation or (2) as behavior leading to unusual or unexplained market outcomes. Circumstances include a) withholding of generation capacity under circumstances in which it would normally be offered in a competitive market; b) unexplained or unusual redeclarations of availability; c) unusual trades or transactions; d) pricing and bidding patterns that are inconsistent with prevailing supply and demand conditions; and e) unusual activity or circumstances relating to imports from or exports to other markets or exchanges. *Am. Elec. Power Serv. Corp. et al.,* 103 FERC 61,346 (2003).

interaction between federal administrative law and federal antitrust law; thereby no state law preemption issue was presented in these cases. In *California v. Federal Power Commission*, a gas company filed a motion to dismiss the antitrust suit pursuant to the Clayton Act, § 7 as amended 15 U.S.C.A. § 18, or in the alternative, to stay it, pending completion of the proceedings for its authority to acquire another company's assets pursuant to the Natural Gas Act (the "NGA"), § 7(c) as amended 15 U.S.C.A. § 717f(c), before the Power Energy Commission. 369 U.S. at 483, 82 S.Ct. 901. In *Otter Tail Power*, the government brought an action against an electric power company to enjoin violations of the Sherman Act, 15 U.S.C.A. § 2. 410 U.S. at 368, 93 S.Ct. 1022. In order to protect market competition in certain cases, Congress did not expressly displace federal antitrust laws. The Court will not address whether Congress has left room for enforcement of state antitrust laws because OPL does not argue that state antitrust law and federal antitrust law would be impacted the same way. Further, the Court notes that the Ninth Circuit in *Snohomish* and *Dynegy* did not discuss the issue of the similarity between California antitrust law and Sherman Act.[7]

Second, and more importantly, a critical distinction between the instant matter and the two cited cases is that there is a regulatory scheme against anti-competitive behavior that has been entrusted to FERC. As the Court discussed above, the statute under 16 U.S.C.A. §§ 824d, 824e(a) provides FERC with broad remedial authority to address anti-competitive behavior. In fact, FERC has exercised this power to act in the proceedings instituted against the Debtors concerning alleged market manipulation during the energy crisis. FERC has asserted that it "can order disgorgement of monies above the post-October 2, 2000 refunds ordered in the California Refund Proceeding, if it finds violations of the ISO and the PX tariffs and finds that a monetary remedy is appropriate for such violations. It can additionally order additional disgorgement of unjust profits for tariff violations that occurred after October 2, 2000." 103 FERC ¶ 61,346. Further, "implicit in Commission orders granting market-based rates to the marketers is a presumption that a company's behavior will not involve fraud, deception or misrepresentation. Companies failing to adhere to such standards were and are subject to revocation of their market-based rate authority." 106 FERC ¶ 61,024.

In contrast, the court in *California v. Federal Power Commission* concluded that the NGA did not contain a provision to immunize the carriers involved in the mergers from the Clayton Act. 369 U.S. at 485, 82 S.Ct. 901. "The Commission's standard, set forth in § 7 of the NGA, will serve 'the public convenience and necessity.' If existing natural gas companies violate the antitrust laws, the Commission is directed by § 20(a) to 'transmit such evidence' to the Attorney General." *Id.* at 486, 82 S.Ct. 901. Similarly, the Court in *Otter Tail Power* found that the limited authority of the Federal Power Commission to order interconnections was not intended to be a substitute for the Sherman Act. 410 U.S. at 375, 93 S.Ct. 1022. Moreover, the Supreme Court in *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966)

---

7. In *Snohomish*, consumer utility in Washington sued generators and traders of wholesale electricity, for violations of California state antitrust and consumer protection laws. 384 F.3d 756. In *Dynegy*, Attorney General of the State of California brought state court actions against wholesale electricity suppliers for violations of California's unfair business practices law. 375 F.3d 831.

declined to grant antitrust immunity to a shipping company because "the provisions of the Shipping Act, 46 U.S.C.A. § 801, can not reasonably be construed as an implied repeal of antitrust regulation of the shipping industry's rate-making activities." *Id.* at 217, 86 S.Ct. 781. The Shipping Act does not give the Federal Maritime Commission (the "FMC") any mandate to regulate rate competition and the statutory scheme was designed to minimize the role of the FMC. *Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 422, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

The Court further finds that *Grays Harbor* and *Gulf States Util. Co. v. Alabama Power Co.,* 824 F.2d 1465 (5th Cir.1987) are not applicable in the instant case. The courts in both cases concluded that the Claims concerning contractual disputes were not within the scope of FERC's jurisdiction. The Court finds that the facts here are distinguishable. First, the Claims in the cited cases were related to contractual issues, which exclusively fall within a state's jurisdiction. The court in *Grays Harbor* granted the utility leave to amend its complaint to seek declaratory relief only as to issues of contract formation. 379 F.3d. at 652–53. Similarly, the court in *Gulf States* held that executed contract performance, such as the failure to negotiate in good faith and fraud, were not preempted by the FPA. 824 F.2d at 1474. Here, no evidence or argument presented before the Court demonstrates that there is an issue involving contractual disputes. Second, contract formation issues would not necessarily intrude upon the rate-setting jurisdiction of FERC. *Grays Harbor,* 379 F.3d. at 653. Therefore, field preemption bars OPL from pursuing the Claims.

### C. Conflict Preemption

As to conflict preemption, for the foregoing reasons, the Court concludes that FERC has broad authority concerning anti-competitive activities related to the filed rate, apart from that FERC has authority to determine the "just and reasonable" rates for wholesale power. A conflict between the FPA in which grants FERC jurisdiction over the anti-competitive acts and state antitrust claims exists. Accordingly, conflict preemption also bars OPL from pursuing the Claims.

### D. Filed Rate Doctrine

Another threshold question before the Court is whether the Court would have to determine a tariff. The filed rate doctrine is essentially a rule of jurisdiction whose applicability is circumscribed by both the congressionally mandated jurisdiction of the regulatory agency and the occurrence of the triggering event of filing a rate or tariff. The filed rate doctrine is applicable where rates were filed with a federal regulatory agency and where the offending transactions are carried out with reference to a filed tariff. *E. & J. Gallo Winery v. Encana Energy Servs., Inc.,* Case No. CV F 03–5412 AWILJO. at 15. The Court recognizes that the filed rate doctrine "forbids a regulated entity from charging rates for its service other than those properly filed with the appropriate federal regulatory authority." *Ark. La. Gas Co. v. Hall,* 453 U.S. 571, 577–78, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). The Court also acknowledges that the purpose of the doctrine is "preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant." *City of Cleveland v. FPC,* 525 F.2d 845, 854 (D.C.Cir.1976).

In addition, FERC required each seller to file quarterly reports pursuant to FPA § 205(c) 16 U.S.C. § 824d(c) on transac-

tion-specific information about its sales and purchases at market-based rates. The court in *Grays Harbor* concluded "while market-based rates may not have historically been the type of rate envisioned by the filed rate doctrine, they do not fall outside the purview of the doctrine." 379 F.3d at 651.

Further, the Court agrees with the opinion of the *California v. FERC* court which concluded that "the reporting requirements are an integral part of a tariff, with FERC's implied enforcement mechanisms sufficient to provide substitute remedies for the obtaining of refunds for the imposition of unjust, unreasonable and discriminatory rates." 383 F.3d at 1016. On August 13, 2002, FERC's Initial Report in Docket No. PA02–2–000 concluded that the Debtors engaged in the deliberate submission of false information or the deliberate omission of material information.[8] Then, FERC concluded that such behavior constituted market manipulation and resulted in unjust and unreasonable rates and violated the express requirements in the orders allowing the Debtors to make sales at market-based rates. 106 FERC ¶ 61,024. As noted by FERC,

> implicit in Commission orders granting market-based rates is a presumption that a company's behavior will not involve fraud, deception or misrepresentation. Companies failing to adhere to such standards were and are subject to revocation of their market-based rate authority. The Debtors were expressly directed, when they were granted market-based rate authority, to inform the FERC promptly of changes in status (which would include changes in their generation market shares) that reflect a departure from the characteristics that

the FERC relied upon in granting market-based rate authority. *Id.*

Moreover, the Court in *California v. FERC,* indirectly recognized the application of the filed rate doctrine when marketers had not properly reported to FERC where such improper reporting affected the reasonableness of the tariff approved by FERC. 383 F.3d at 1016.

> Without the availability of retroactive refunds, "[p]arties aggrieved by the illegal rate would have no FERC remedy, and the filed rate doctrine would preclude a direct action against the offending seller. That result does not comport with the underlying theory or the regulatory structure established by the FPA." *Id.*

The Court finds that determining the liability or the legal right of OPL against the Debtors for violation of the antitrust laws would have to be measured by the tariff. In addressing the right of action that a violation of the antitrust laws gives to one who has been injured in its business or property, the Supreme Court in *Keogh v. Chicago & N.W.R.Y. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), stated that "[i]njury implies violation of a legal right." *Id.* at 163, 43 S.Ct. 47. The Supreme Court concluded that "the legal rights of [a] shipper as against [a] carrier in respect to a rate are measured by the published tariff." *Id.* at 163, 43 S.Ct. 47. Justice Brandeis explained "[a] rate is not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the Anti–Trust Act. What rates are legal is determined by the Act to Regulate Commerce. Under Section 8 of the latter act ... the exaction of any illegal rate makes the carrier liable to the 'person injured thereby for the full amount of

---

**8.** FERC found that the Debtors failed to inform FERC in a timely manner of changes in their market shares that resulted from their gaining influence/control over others' facilities, as required under their market-based rate authorization. 106 FERC ¶ 61,024.

damages sustained in consequence of any such violation.'" *Id.* at 162, 43 S.Ct. 47. Thus, the finding of liability in antitrust laws would be integral to the Court's determination of whether the Debtors are liable due to their violations of state antitrust law and unfair competition law. For instance, the Court could not determine the overcharge claim owed by the Debtors for any electricity market manipulation without first deciding the reasonableness of the filed tariff.

The Supreme Court case, *Arkansas Louisiana*, further supports the Court's position that the filed rate doctrine should apply here. "In asserting that the filed rate doctrine had no application, respondents in *Arkansas Louisiana* contended that the state court has done no more than determine the damages they have suffered as a result of the breach of a contract by a gas company." 453 U.S. at 579, 101 S.Ct. 2925. The Supreme Court rejected this argument by reasoning that "the mere fact that respondents brought this suit under state law would not rescue it, for when Congress has established an exclusive form of regulation ... there can be no divided authority over interstate commerce.... Under the filed rate doctrine, FERC alone is empowered to make that judgment, and until it has done so, no rate other than the one on file may be charged." *Id.* at 580–84, 101 S.Ct. 2925.

Moreover, to award monetary relief, the Court would have to determine a "fair price." Thus, the filed rate doctrine bars the Court from awarding monetary damages sought by OPL. Nonetheless, the Court finds that injunctive relief would also be unavailable to OPL. The Court agrees with the Ninth Circuit's decision in *Snohomish,* which declined to grant injunctive relief because such relief is barred by the filed rate doctrine and preemption principle. 384 F.3d at 762. "Remedies for breach and non-performance of FERC-approved operating agreements in the interstate wholesale electricity market fall within the exclusive domain of FERC." *Dynegy,* 375 F.3d at 836.

The decisions from the Second Circuit in *Sun City Taxpayers' Association v. Citizens Utilities Co.,* 45 F.3d 58 (2d Cir.1995) and *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17 (2d Cir.1994), provide an additional basis for dismissal of the Claims sought by OPL. The Second Circuit in *Sun City Taxpayers' Association* affirmed the decision from the district court, which had declined the plaintiff's invitation to find a fraud exception to the filed rate doctrine. In determining whether the filed rate doctrine applied, the court focused on the impact the court's decision would have on agency procedures and rate determination. *Sun City Taxpayers' Ass'n v. Citizens Utils. Co.,* 847 F.Supp. 281, 291 (D.Conn. 1994). The Second Circuit in *Wegoland* recognized that the filed rate doctrine exists for reasons independent of the type of plaintiff maintaining the action. Those reasons include that (a) legislatively appointed regulatory bodies have institutional competence to address rate-making issues, (b) courts lack the competence to set utility rates, and (c) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime. 27 F.3d at 21.

Therefore, having considered the policy objectives, the Court finds it is inappropriate to frustrate FERC's jurisdiction afforded by Congress. The Court lacks authority to impose a different rate than the one approved by a federal agent. Any other conclusion departing from this principle would undermine the filed rate doctrine. The Court, therefore, rejects OPL's challenge to the application of the filed

rate doctrine. Accordingly, the filed rate doctrine bars the relief sought by OPL.

## 2. Motion to Amend[9]

### A. General Standards For Permitting A Post–Bar Date Amendment To Timely–Filed Proofs Of Claim

Bankruptcy Rule 3003(c)(3) directs a bankruptcy court to establish a bar date beyond which proofs of claim are disallowed in a chapter 11 case. The bar date is critically important to the administration of a successful chapter 11 case for it intended "to be a mechanism providing the debtor and its creditors with finality." *In re Manville Forest Products Corp.*, 89 B.R. 358, 374 (Bankr.S.D.N.Y.1988). In particular, a " 'bar [date] order serves the important purpose of enabling the parties to a bankruptcy case to identify with reasonable promptness the identity of those making claims against the bankruptcy estate and the general amount of the claims, a necessary step in achieving the goal of successful reorganization.' " *In re Keene Corp.*, 188 B.R. 903, 907 (Bankr.S.D.N.Y. 1995) (quoting *First Fidelity Bank, N.A. v. Hooker Invs., Inc. (In re Hooker Invs., Inc.)*, 937 F.2d 833, 840 (2d Cir.1991)). Therefore, a bar date order "does not 'function merely as a procedural gauntlet, . . . but as an integral part of the reorganization process.' " *Id.* (quoting *First Fidelity*, 937 F.2d at 840 (quoting, in turn, *United States v. Kolstad (In re Kolstad)*, 928 F.2d 171, 173 (5th Cir.1991))). Accordingly, a bar date is likened to a statute of limitations which generally must be strictly observed. *Id.* (citing *Maxwell Macmillan Realization Liquidating Trust v. Aboff (In re Macmillan)*, 186 B.R. 35, 49 (Bankr.S.D.N.Y.1995)).

The decision to grant or deny an amendment to a timely-filed proof of claim rests with the sound discretion of a bankruptcy judge. *In re McLean Industries, Inc.*, 121 B.R. 704, 708 (Bankr. S.D.N.Y.1990). "Although amendments to proofs of claim should in the absence of contrary equitable considerations or prejudice to the opposing party be freely permitted, such amendments are not automatic. . . ." *In re W.T. Grant Co.*, 53 B.R. 417, 420 (Bankr.S.D.N.Y.1985). The amendments "are allowed, [however,] where the purpose is to cure a defect in the claim as originally filed, to describe the [original] claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim." *Id.; In re G.L. Miller & Co.*, 45 F.2d 115, 116 (2d Cir.1930) (enumerating same three factors for amending claims). Nevertheless, an "amendment may not be used as a mechanism for circumventing the bar date." *In Re Drexel Burnham Lambert Group Inc.*, 151 B.R. 684, 694 (Bankr. S.D.N.Y.1993). Therefore, a bankruptcy court must carefully scrutinize a post bar-date amendment "to ensure that the amendment is truly amending timely-filed [proofs of] claims and not asserting an entirely new claim." *In re Macmillan*, 186 B.R. at 49; *see In re Alexander's Inc.*, 176 B.R. 715, 723 (Bankr.S.D.N.Y.1995) (citing *In re W.T. Grant*, 53 B.R. at 422). An amendment will not be permitted when its purpose is to create an entirely new claim. *In re Andover Togs, Inc.*, 231 B.R. 521, 549 (Bankr.S.D.N.Y.1999).

When deciding whether to permit an amendment to a proof of claim, a bankruptcy court is guided by a two-prong

---

**9.** The Court addressed issue of whether a Claimant may amend a timely-filed proof of claim to include an additional claim in its memorandum decision in *In re Enron Corp.*, 298 B.R. 513, 518–26 (Bankr.S.D.N.Y.2003). This section of the Opinion is based on the legal analysis regarding an amendment as set forth in *In re Enron Corp.*

test. *Integrated Resources, Inc. v. Ameritrust Co. N.A. (In re Integrated Resources, Inc.)*, 157 B.R. 66, 70 (S.D.N.Y.1993) (citing *In re Black & Geddes, Inc.*, 58 B.R. 547, 553 (S.D.N.Y.1983)). "A court must 'first look to whether there was timely assertion of a similar claim or demand evidencing an intention to hold the estate liable.' " *Id.* (quoting *Black & Geddes*, 58 B.R. at 553). If there were such a timely assertion, the court then examines each fact within the case and determines whether it would be equitable to allow the amendment. *Id.* In balancing the equities, the court considers the following equitable factors:

> (1) undue prejudice to opposing party; (2) bad faith or dilatory behavior on part of the claimant; (3) whether other creditors would receive a windfall were the amendment not allowed; (4) whether other claimants might be harmed or prejudiced; and (5) the justification for the inability to file the amended claim at the time the original claim was filed.

*Integrated Resources*, 157 B.R. at 70 (quoting *McLean Industries*, 121 B.R. at 708); *see also In re Miss Glamour Coat Co., Inc.*, 1980 U.S. Dist. LEXIS 14545, at *12–13, 1980 WL 1668, at *4–5 (S.D.N.Y. 1980) (formulating similar equitable factors for considering in applying the two-prong test in permitting an amendment to a proof of claim). This second prong of the test is applied "only if the first prong is satisfied and the claim qualifies as an amendment and not a new claim." *In re Sage–Dey, Inc.*, 170 B.R. 46, 49 (Bankr. N.D.N.Y.1994).

## B. Application Of Rule 15(c) Of The Federal Rules Of Civil Procedure

Neither the Bankruptcy Code nor Bankruptcy Rules directly address an amendment of a proof of claim. Nevertheless, in determining whether to permit a post-bar date amendment to a timely-filed proof of claim under the first prong of the two-prong test, several courts have applied Rule 15(c) of the Federal Rules of Civil Procedure ("Rule") by analogy or explicitly, pursuant to Bankruptcy Rules 7015 and 9014(c), to analyze such an amendment. *See Enjet, Inc. v. Maritime Challenge Corp. (In re Enjet, Inc.)*, 220 B.R. 312, 315 (E.D.La.1998) (noting that "numerous courts have applied Rule 7015 and Rule 15(c) explicitly or by analogy in non-adversary [bankruptcy] proceedings"); *In re Brown*, 159 B.R. 710, 714 (Bankr.D.N.J. 1993) (noting that Rule 15's "standards for allowing amendments to pleadings in adversary proceedings ... also apply to amendments to a proof of claim"); *Liddle v. Drexel Burnham Lambert Group, Inc.*, 159 B.R. 420, 425 (S.D.N.Y.1993) ("[S]everal courts have held that the analysis for amendment of claims in bankruptcy is identical to the analysis required by Rule 15"); *McLean Industries*, 121 B.R. at 710 ("The test under Rule 15 is basically the same as that developed in the case law for amending claims in bankruptcy ...").

Bankruptcy Rule 7015 provides that "Rule 15 ... applies in adversary proceedings." Although " 'the filing of an objection to a proof of claim is a contested matter,' [and] not an adversary proceeding[,] ... Bankruptcy Rule 9014 permits a [bankruptcy] court, at its discretion, to extend Rule 7015 to contested matters as well as adversary proceedings." *In re Stavriotis*, 977 F.2d 1202, 1204 (7th Cir. 1992) (citations omitted). In particular, Bankruptcy Rule 9014(c) states that "[t]he court may at any stage in a particular matter direct that one or more of the other rules in Part VII [which includes Bankruptcy Rule 7015] shall apply" and, further, the Advisory Committee Note to the rule provides that "[w]hen the rules of Part VII are applicable to a contested matter, reference in the Part VII rules to

adversary proceedings is to be read as a reference to a contested matter." "Part VII of the [B]ankruptcy [R]ules is 'based on the premise that to the extent possible practice before the bankruptcy courts and the district court[s] should be the same.'" *Stavriotis*, 977 F.2d at 1204 (quoting Advisory Committee Note to Bankruptcy Rule 7001). Accordingly, the Court exercises its discretion under Bankruptcy Rule 9014(c) in applying by analogy the standards of subsections (c)(2) of Rule 15 to determine whether OPL's Gas Claims relate back to its original Claims against the Debtors.

Rule 15(c) provides, in pertinent part, that

[a]n amendment of a pleading relates back to the date of the original pleading when

. . .

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading,

Fed.R.Civ.P. 15(c)(2) (2004). After the statute of limitations has run (here, the Bar Date), Rule 15(c)(2) is used for amending an original pleading (here, the original Proof of Claim) to add a claim or defense.

"Courts, in general, have moved away from the cause of action' test in allowing an amendment under Rule 15 . . ., and instead, on [sic] amendment has been allowed which adds another claim if it is 'arising out of the same transaction or occurrence.'" *Miss Glamour*, 1980 U.S. Dist. LEXIS 14545, at *9, 1980 WL 1668, at *3–4; *see In re Soly Srour*, 138 B.R. 413, 418 (Bankr.S.D.N.Y.1992) (holding same). The Claims concerning market manipulation in the wholesale electricity market arise out of certain trading strategies that the Debtors utilized in the California wholesale electricity markets, which allegedly wrongfully inflated the electricity bills of California ratepayers. The trading strategies, which OPL alleges as unlawful, unfair and fraudulent business practices in the original Claims, include as follows:

(1) The Debtors manipulated supplies in the California *wholesale electricity markets* by withholding supplies from the PX and ISO markets. Thus creating artificial shortages of electricity which, in turn, raised prices, (2) the Debtors engaged in a "megawatt laundering," whereby Enron purchased electricity from a California generator, but instead of directly bidding the power into the PX or ISO markets, the trader sold the rights to the power to an affiliate outside of California. The affiliate then would sell the rights to the power back into California at even greater prices in order to inflate the price of electricity, (3) the Debtors engaged in a practice of scheduling energy over a transmission line that it knew would be congested at a given point, even though it had no intention of actually using that line for transmission, in order to receive a payment not to use that line. (emphasis added).

By comparison, the practices of market manipulation in the Gas Claims include wash trades, also known as churning, and false reporting of gas market transactions to publications for compilation and price indexes. Wash trading occurs when a party simultaneously buys and sells the same commodity at or near the same price within a very short period time so that the party has no financial risk in the transactions. Wash trading establishes "bogus" prices which are not related to real conditions in the gas market, and creates an illusion of volume and liquidity which encourages other market participants to engage in the frenzy. Thus, the Court finds that the underlying alleged practices by

the Debtors in two markets were vastly different.

Additionally, the legal analysis regarding each of the two markets is different because they are regulated by different federal acts. The Natural Gas Act (the "NGA") regulates the gas market, while the FPA regulates the electricity market. While the jurisdictional provisions of the FPA and the NGA may be similar, because of the unique context of the natural gas market during the energy crisis in California, the legal conclusion on whether the NGA preempts state law claims may be drawn differently from the Court's finding in the electricity market. Actually, the district court in Nevada, *In re Western States Wholesale Natural Gas Antitrust Litigation,* 346 F.Supp.2d 1123 (D.Nev. 2004), held that NGA did not completely preempt state law claims. While the Court does not address herein the issue as to whether the NGA preempts state law claims, the Court notes the differences in the two markets. For instance,

> unlike the electricity market, where FERC reviews and approves detailed tariffs filed by the PX and the ISO, at the time of the alleged misconduct in the natural gas market, FERC granted blanket approval for most gas sales. Unlike the energy market, the natural gas market largely was deregulated at the time of the alleged anti-competitive conduct. At that time, section 284.402 of the FERC regulations contained no explicit guidelines on misconducts, such as churning, spot market, wash sales and netting agreements in gas market. Unlike the energy industry, which partially was regulated by the FERC-supervised ISO and PX, the natural gas industry was driven almost completely by the market forces of supply and demand.[10]

Rule 15(c)(2) requires the Court to consider whether the asserted Gas Claims arose out of the same transaction or occurrence set forth in the original Claims. In its original Claims, OPL made it clear that the perimeter of the alleged market manipulation claims against the Debtors is drawn by OPL within the wholesale electricity market, by stating as follows: "the [original] [C]laim[s] arise out of certain trading strategies that the Debtors utilized in the California *wholesale electricity markets,* which wrongfully inflated the electricity bills of California ratepayers. By engaging in *these* unlawful, unfair, and fraudulent business practices, Enron violated [various state laws]." (emphasis added). *See* OPL's Statement Regarding Proof of Claim.

Here, the Court has found that the trading strategies in the gas markets are not the same as those stated in the original Claims. Further, since vast differences between the gas and electricity market exist, these two markets are not be interchangeable. The Court agrees that the amendment would change the nature of the original Claims by introducing significantly different factual and legal allegations. Accordingly, the Court finds that the Gas Claims do not arise out of the same transaction or occurrence set forth in the original Claims, that is, these two claims are not related under a Rule 15(c) analysis. Moreover, the Court finds that OPL's Gas Claims are not for the purpose of curing a defect in the original Claims, or supplementing the original Claims with greater particularity or to pleading a new theory of recovery on the facts set forth in the Claims.

**10.** Final Report on Price Manipulation in Western Markets: Fact–Finding Investigation of Potential Manipulation of Electric and Natural Gas Price, Docket No. PA02–2–00, II–61 (Mar.2003).

Additionally, in the first prong of the test, "[a] court must 'first look to whether there was timely assertion of a similar claim or demand evidencing an intention to hold the estate liable.'" *Integrated Resources* (quoting *Black & Geddes*, 58 B.R. at 553). Here, even if the Gas Claims are similar to the original Claims, the Court finds that OPL failed to timely assert the Gas Claims. OPL argues that it put the Court and the Debtors "on notice" in the footnote of the Partial Objection in September 2003. In the footnote, OPL states as follows: "information regarding the Debtor's misuse of the Enron Online natural gas trading platform and its impact on California electricity and natural gas prices, did not become public until after the Claimant filed the Proofs of claim. This misconduct, as well as the Debtors' other misconduct described in the FERC report, is equally at issue in determining the Debtors' liability to California ratepayers." *See*, footnote 2 of the Partial Objection.

The Court finds that even if footnote 2 sufficiently placed the Debtors on notice as to the inclusion of the alleged gas market manipulation claims in its original Claims against the Debtors under the standard of a motion to amend, such notice was not timely. In that, in August 2002, FERC issued the Initial Report, containing, *inter alia*, the relevant findings regarding the assertions of the Debtors' natural gas market manipulation. On October 11, 2002, Attorney General of the California timely filed proofs of claim regarding the Debtors' alleged manipulation in the electricity and gas markets. In March 2003, FERC issued the Final Report. The claimed notice came six months after the FERC's Final Report and thirteen months after the FERC's Initial Report was available. Both FERC reports discussed the Debtors' alleged manipulation in the electricity and gas markets.

Further, regarding the timing of the motion to amend, the Debtors' Plan was confirmed on July 15, 2004 and the Plan became effective on November 17, 2004. OPL filed motion to amend eight months after the confirmation of the Plan and four months after the Plan had become effective, as well as roughly two and half years after the October 15, 2002 bar date. Most significantly, OPL's motion to amend was filed at least eighteen months after OPL referenced the gas market manipulation claims in its claimed notice, and thirty-one months after FERC's Initial Report became available, containing the relevant information regarding the assertions of the Debtors' gas market manipulation (the State of California and California Department of Water Resources asserted the gas manipulation claims in their timely filed proofs of claim dated October 11, 2002, based on the FERC's finding on the Debtors' alleged misconduct in the gas market in Initial Report. In that FERC's Final Report was not issued until March 2003). Accordingly, the Court finds that the length of the delay in filing the Gas Claims here is substantial.

Thus, OPL has failed to meet the first prong of the test, *i.e.*, it has failed to establish that the amendment was a timely assertion of a similar claim or demand evidencing an intention to hold the estate liable. The second prong of the test on equitable factors is applied "only if the first prong is satisfied, and the claim qualifies as an amendment and not a new claim." *In re Sage–Dey, Inc.*, 170 B.R., at 49. Here, OPL's Gas Claims are new and do not relate back to its original Claims. Thus, the Court does not need to address the second prong of the test. Additionally, the Court considers OPL's new Gas Claims as "other or further claims" that are barred, absent some form of relief, by,

*inter alia*, the Confirmation Order.[11] Therefore, based upon OPL's failure to satisfy the first prong of the test, the motion to amend is denied.

### 3. Filed Rate Doctrine Bars the Gas Claims

■ The filed rate doctrine would apply to preclude the Court from considering the Gas Claims even if the motion to amend were allowed. As discussed previously, there were vast differences between the gas and the electricity markets during the energy crisis in California, and the Court notes that the Nevada court in *Natural Gas Antitrust Litigation*, 346 F.Supp.2d 1123, held that NGA did not completely preempt state law claims. However, regardless of the outcome of preemption issue, the Court is barred from considering the Gas Claims because determining the Debtors' liability or the legal right of OPL against the Debtors for violation of the antitrust laws would have to be measured by the tariff. The Court agrees with the Nevada court in its separate decision concerning the filed rate doctrine, *In re Western States Wholesale Natural Gas Antitrust Litigation* 368 F.Supp.2d 1110 (D.Nev.2005). "The essential purpose of the filed rate doctrine is to protect the jurisdiction of a regulatory body that Congress has designated to determine whether rates charged, such as those in the natural gas market, are just and reasonable. Under the NGA, FEC retains statutory authority over wholesale natural gas prices and therefore the filed rate doctrine applies even though FERC, in exercising its authority, chose to move toward a market-based system." *Id.* at 1116. Based on the reasons that the Court discussed previously in Section 1.D (Filed Rate Doctrine), the Court lacks authority to impose a different rate than the one approved by a federal agent. Any other conclusion departing from this principle would undermine the filed rate doctrine. Accordingly, the filed rate doctrine would bar the relief sought by OPL, even if the motion to amend were granted.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the Claims sought by OPL concerning electricity market manipulation are preempted by the FPA and precluded by the filed rate doctrine. Therefore, the Court sustains the Debtors' objection to the Claims filed by OPL. Further, because OPL's Gas Claims do not relate back to its original Claims, and the amendment was not timely filed, the motion to amend is denied. The Court further finds that even if the Gas Claims were allowed to be filed, the filed rate doctrine would bar the Court from considering the OPL's Gas Claims against the Debtors.

Counsel for the Debtors is directed to settle an order consistent with this Opinion.

---

11. The Confirmation Order provides that "[a]ll Persons and Entities are hereby precluded from asserting against the Debtors ... any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not the facts or legal bases therefore were known or existed prior to the Confirmation Date...." *See*, Order Confirming Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, and Related Relief, p. 22.