*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0219p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JORDAN KATZ; GABY HASROUNI; GINA
HASROUNI; CRAIG MINTZ; SEAN
NIGHTINGALE; MICAH WATTS; CAROL A.
RHAMY; KATHERINE A. WIRKUS; ADAM C.
FALKNER,

        *Plaintiffs-Appellants,*

    *v.*

FIDELITY NATIONAL TITLE INSURANCE
COMPANY, et al.,

        *Defendants-Appellees.*

No. 10-3545

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 08-00677—Sara E. Lioi, District Judge.

Argued: October 7, 2011

Decided and Filed: July 17, 2012

Before: BOGGS and STRANCH, Circuit Judges; and THAPAR,[*] District Judge.

_____

## COUNSEL

**ARGUED:** Daniel B. Allanoff, MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C., Philadelphia, PA, for Appellants. David M. Foster, FULBRIGHT & JAWORSKI L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Daniel B. Allanoff, Bruce K. Cohen, MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C., Philadelphia, PA, Eugene A. Spector, SPECTOR ROSEMAN & KODROFF, P.C., for Appellants. David M. Foster, FULBRIGHT & JAWORSKI L.L.P., Washington, D.C., Deborah A. Coleman, Arthur M. Kaufman, HAHN LOESER & PARKS LLP, Cleveland, Ohio, Kerin Lyn Kaminski, GIFFEN & KAMINSKI, LLC, Cleveland, Ohio, Russell Kutell, FROST BROWN TODD LLC, Columbus, Ohio, David G. Greene, Kevin J. Walsh, LOCKE LORD BISSELL & LIDDELL LLP, New York, New York, James I. Serota,

_____

[*] Hon. Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

GREENBERG TRAURIG, LLP, New York, New York, Patricia A. Screen, BROUSE McDOWELL LPA, Cleveland, Ohio, Edward A. Matto, STEPTOE & JOHNSON, PLLC, Columbus, Ohio, for Appellees.

———————————

**OPINION**

———————————

BOGGS, Circuit Judge. These consolidated cases are eight of at least forty-five lawsuits nationwide, alleging that title-insurance companies and rating bureaus violated state and federal antitrust laws by conspiring to charge inflated rates. *See In re Title Ins. Real Estate Settlement Procedures Act & Antitrust Litig.*, 560 F. Supp. 2d 1374, 1376 (J.P.M.L. 2008) (denying consolidation of twenty-five pending title-insurance antitrust cases; mentioning "at least twenty related actions"). The district court dismissed all of Appellants' claims with prejudice. It held, first, that the filed-rate doctrine foreclosed damages and any injunctive relief that would interfere with an already-filed rate;[1] and, second, that the McCarran-Ferguson Act, along with Title XXXIX of the Ohio Revised Code, barred Appellants' federal and state antitrust actions altogether. We reach the same conclusion through different reasoning. We hold that the McCarran-Ferguson Act and Title XXXIX of the Ohio Revised Code prevent Appellants from maintaining any antitrust action based on Appellees' title-insurance rate filings. As such, the filed-rate doctrine, which limits the antitrust remedies available to private parties, is irrelevant. We therefore affirm the district court's dismissal, with prejudice, of Appellants' complaint.

I

Jordan Katz and eight other named plaintiffs ("Appellants") brought suit on behalf of themselves and all other purchasers of title insurance in Ohio from March 2004 through the present. They alleged that twenty-two title-insurance companies and the

———————————

[1] Although these cases involve the filed-rate doctrine's antitrust implications, the doctrine also applies when rate-payers challenge the rate they have been charged. In that situation, the filed-rate doctrine protects the company. The doctrine requires that the company charge only the rate it filed, prevents it from charging any other rate, and bars private suits based on the properly filed and duly approved rates. *See, e.g.*, *In re Investigation of Nat'l Union Fire Ins. Co.*, 66 Ohio St. 3d 81 (Ohio 1993).

Ohio Title Insurance Rating Bureau ("Appellees") violated state and federal antitrust laws by conspiring to set unreasonably high title-insurance rates.[2]

Appellee title-insurance companies filed rates with the Ohio Department of Insurance through a properly licensed rating bureau, the Ohio Title Insurance Rating Bureau ("OTIRB"). Appellants claimed that it was "impossible for the Department of Insurance to review, regulate or supervise the reasonableness of the rates collectively set by defendants because those rates are based principally on undisclosed costs." The "undisclosed costs," Appellants alleged, included "kickbacks, referral fees and other expenses designed to solicit business referrals."[3] They contended that these inducements led to an "increase [in] the prices Ohio title insurance purchasers . . . paid compared to what they would have paid absent defendants' joint illegal conduct." Appellants urge that such an increase in price, resulting from unlawful collaboration, is actionable under § 1 of the Sherman Act, 15 U.S.C. § 1, and under the Valentine Act, OHIO REV. CODE §§ 1331.01–1353.06, Ohio's antitrust statute. They seek both injunctive relief and damages.

Appellees "filed a joint motion to dismiss on the grounds that Plaintiffs' claims were barred by the filed-rate doctrine and by the McCarran-Ferguson Act." The district court referred these motions to a magistrate judge, who issued a Report and Recommendation, suggesting that all claims be dismissed. The magistrate judge did, however, state that Appellants should have "an opportunity to . . . modify the Complaint in order to present a prayer for non-rate-related injunctive relief that might survive the Filed Rate Doctrine."

After considering objections from both parties, the district court issued a Memorandum Opinion. It held, first, that the filed-rate doctrine applied to title insurance, and so foreclosed Appellants' claims for monetary damages, but left open the possibility of injunctive relief that would not interfere with rates already filed. Next, it

---

[2]Title insurance is "[a]n agreement to indemnify against loss arising from a defect in title to real property." BLACK'S LAW DICTIONARY 819 (8th ed. 2004).

[3]Title XXXIX prohibits such inducements. *See* OHIO REV. CODE § 3953.26.

held that the McCarran-Ferguson Act barred Appellants' federal antitrust claims, and that Appellees' conduct did not violate the Valentine Act because it was permissible under Title XXXIX of the Ohio Revised Code.  The district court further concluded that dismissal with prejudice was appropriate because the McCarran-Ferguson Act and Title XXXIX completely foreclosed Appellants' federal and state antitrust claims.  Appellants timely appealed.

## II

We review the grant of  a motion to dismiss *de novo*.  *Federal-Mogul U.S. Asbestos Pers. Injury Trust v. Cont'l Cas. Co.*, 666 F.3d 384, 387 (6th Cir. 2011).  We may "affirm the district court's dismissal of a plaintiff's claims on any grounds, including grounds not relied upon by the district court." *Ibid.* (quoting *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009)).  In this analysis, "[a]ll well-pleaded facts in the complaint are accepted as true," *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009), and "we construe the complaint in the light most favorable to the non-moving party." *Federal-Mogul*, 666 F.3d at 387. A complaint will survive a motion to dismiss only if it "contain[s] . . . enough facts to state a claim to relief that is plausible on its face." *Ibid.* (internal citations and quotations omitted); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949–50 (2009).

## III

## A

The McCarran-Ferguson Act provides: "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." 15 U.S.C. § 1012(a).  Generally, "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." *Id.* at § 1012(b).  However, "the Sherman Act . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law." *Ibid.*  Title XXXIX of the Ohio Revised Code

regulates insurance.  *See* OHIO REV. CODE § 3901.01 (creating department of insurance); *id.* at §§ 3901.01–3999.99.  Accordingly, the McCarran-Ferguson Act bars Appellants' federal antitrust action if title insurance is "the business of insurance" within the meaning of the Act.  15 U.S.C. § 1012(a)–(b).

> There are
>
> > three criteria relevant in determining whether a particular business or practice is part of the "business of insurance" exempted from the antitrust laws . . . *first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry.

*Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982).  No single factor in this analysis is dispositive.  *Ibid.*  Rather, we must analyze allegedly anti-competitive behavior holistically, keeping in mind that the McCarran-Ferguson antitrust "exemption is for the 'business of insurance,' not the 'business of insurers.'"  *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211 (1979).

Here, the district court correctly held that title-insurance rate-making was "the business of insurance," within the meaning of the McCarran-Ferguson Act.  Appellants below did not dispute the magistrate judge's finding that title insurance met the second and third elements of the *Royal Drug-Pireno* test.  Thus, only the first factor, "whether the practice has the effect of transferring or spreading a policyholder's risk," *Pireno*, 458 U.S. at 129, was at issue.

As the court below noted, the first *Pireno* factor requires only that a product spread some risk; it does not specify any particular quantity.  *See id.* at 129–30; *SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 71 (1959) (holding that variable annuity was not the business of insurance because it placed *no* risk of loss on the issuer).  The amount of risk spread, however, is still relevant: it bears on the first factor's weight in the multifaceted *Pireno* analysis.  The instant case illustrates this point.  There is no dispute that title-insurance policies are priced well above most estimates of the risk

involved. *See* Appellants' Br. at 28; Appellees' Br. at 38–39. Likewise, however, there is no dispute that title-insurance rate-setting "is an integral part of the policy relationship between the insurer and the insured; and . . . is limited to entities within the insurance industry." *Pireno*, 458 U.S. at 129. Hence, title-insurance rate-setting satisfies each *Pireno* criterion. That one factor is weak while others are strong need not change the ultimate conclusion. Rigid insistence on substantial risk-spreading is not required. Rather, courts must examine products or practices "with respect to all three criteria." *Ibid.* Because title-insurance rate-setting spreads some risk, is a foundational piece of the policy relationship between the insurer and the insured, and has no application outside the context of insurance, it is clearly part of the business of insurance, within the meaning of *Pireno*.

This conclusion is consistent with the policy of the McCarran-Ferguson Act. As the district court observed, rate-making is a key part of insurance regulation. In fact, "[t]he floor debates [on the McCarran-Ferguson Act] . . . focused simply on whether cooperative rate making should be exempt [from antitrust law]." *Royal Drug*, 440 U.S. at 223. One of the Act's sponsors, Senator Ferguson, said on the Senate floor: "[W]e cannot have open competition in fixing rates on insurance. If we do, we shall have chaos." *Ibid.* (citing 91 Cong. Rec. 1481 (1945)). Other comments in the floor debates "also indicated a primary concern that cooperative ratemaking would be protected from the antitrust laws." *Ibid.* Even President Franklin Roosevelt indicated that the McCarran-Ferguson Act would allow companies to work together in setting rates when he signed the bill. *Id.* at 223–24. To hold that title-insurance rate-making is not subject to antitrust scrutiny would be to ignore Congress's purpose, and improperly to impose federal oversight on an extensive state regulatory scheme. *Id.* at 224 (quoting President Roosevelt's statement in S. Rosenman, The Public Papers and Addresses of Franklin D. Roosevelt, 1944–45 Vol., p. 587 (1950), that "Congress . . . was willing to permit actual regulation of [cooperatively set] rates by affirmative action of the States"). We do not take such a tack. Instead, we hold that the district court was correct to conclude that title insurance is the business of insurance, within the meaning of the McCarran-Ferguson Act.

Appellants nevertheless argue that the district court erred.  At the outset, they claim that, because the Supreme Court called risk-spreading an "indispensable characteristic of insurance," the first *Pireno* factor is a "threshold requirement[] for application of McCarran-Ferguson Act Immunity." Appellants' Br., at 21–22 (internal citations omitted).    Appellants then proceed to argue that title insurance involves so little risk-spreading that it does not have "the effect of transferring or spreading a policyholder's risk," *Pireno*, 458 U.S. at 129; *see* Appellants' Br. at 21–30, but instead acts as a limited warranty, protecting purchasers from existing defects in title. Appellants' Br. at 22.  Because risk-spreading is not the "true nature" of title insurance, they claim, title insurance rates are not the business of insurance within the meaning of the McCarran-Ferguson Act, and they may maintain their federal antitrust claims.  *Id.* at 25.

To support this proposition, Appellants cite *Variable Annuity*.  There, the Court addressed the question whether variable annuity contracts were the business of insurance within the meaning of the McCarran-Ferguson Act, and thus exempt from reporting requirements under federal securities laws.  *See Variable Annuity*, 359 U.S. at 73 (Brennan, J., concurring) (labeling the "basic problem involved" as "one of the coverage of two Acts of Congress which concentrated on applying specific forms of regulatory controls to the various ways in which organizations get and administer other people's money").  It held that, while some of the contracts offered did contain "one true insurance feature," *id.* at 73 n.15 (maj. op.), variable annuities generally could not be considered part of the 'business of insurance' because they "place[d] *all* the investment risks on the annuitant, *none* on the company."  *Id.* at 71 (emphasis added).

According to Appellants, *Variable Annuity* establishes that "a court must examine the product [at issue] in order to determine whether it was designed to transfer risk, as in property, casualty and life insurance, or for some other purpose." Appellants' Reply Br. at 19.  Further, they argue that the case shows that, when a product contains only a minimal risk-shifting component, it should not be considered the business of insurance.  Appellants' Br. at 25–26.  Because the title-insurance policies in this case

include "at most, 3.4% of premium loss," Appellants' Reply Br. at 21, Appellants urge, they cannot be considered part of the business of insurance, based on *Variable Annuity*.[4]

Appellants are incorrect at every turn. First, the *Pireno* Court expressly held that no single criterion was determinative in deciding whether a product qualified as the business of insurance. *Pireno*, 458 U.S. at 129 ("None of these criteria is necessarily determinative in itself. "). Appellants' claim that risk-spreading is a threshold requirement, then, is simply contrary to explicit Supreme Court precedent. Second, as the district court pointed out, "the test in *Pierno* [sic] . . . does not quantify any particular amount of risk; it merely calls for a finding of some risk." *See In re New Jersey Title Ins. Litig.*, No. 08-1425, 2010 WL 2710570, at *8 (D.N.J. July 6, 2010). If anything, *Pireno* gives content to *Variable Annuity*'s conclusion that "the concept of 'insurance' involves some investment risk-taking on the part of the company." *Variable Annuity*, 359 U.S. at 71. In any event, *Pireno*, not *Variable Annuity*, is this court's guide. Under the *Pireno* test, title insurance qualifies as the business of insurance. Finally, Appellants "misstate *Variable Annuity*'s holding. The *Variable Annuity* Court held that, for purposes of federal statutory exemptions, including the McCarran-Ferguson Act, the concept of insurance involves some investment risk-taking on the part of the company." *In re New Jersey Title Ins. Litig.*, 2010 WL 2710570, at *8 (internal quotations omitted). The contracts in *Variable Annuity* involved no risk-taking, and therefore were not insurance. Title insurance, by contrast, does involve a risk—small though it may be.

We therefore hold that title insurance is the business of insurance within the meaning of the McCarran-Ferguson Act. Thus, Appellants' federal antitrust claims are barred if Ohio law regulates title insurance. Title XXXIX of the Ohio Revised Code does just that. Accordingly, the McCarran-Ferguson Act prevents Appellants from maintaining their federal antitrust claims.

---

[4] Appellants also cite *United States v. Title Ins. Rating Bureau of Arizona*, 700 F.2d 1247 (9th Cir. 1983), and *In re Ticor Title Ins. Co.*, 112 F.T.C. 344, 1989 WL 1126786 (F.T.C. 1989). These cases, however, are irrelevant. *Rating Bureau of Arizona* addressed escrow services, and *In re Ticor* involved title search and examination charges. In both cases, the court held that the service provided was not the business of insurance. Neither case, however, involved rate-making, a central component of insurance and insurance regulation.

B

The McCarran-Ferguson Act bars Appellants' federal antitrust claims because title insurance qualifies as the business of insurance, and "such business is [] regulated by State law." *See* 15 U.S.C. § 1012(b). The question remains, though, whether Appellees' conduct was permissible under the Ohio Revised Code. The Valentine Act, OHIO REV. CODE §§ 1331.01–1353.06, prohibits "a combination of capital, skill, or acts by two or more persons . . . to fix at a standard figure . . . an article or commodity of merchandise, produce, or commerce intended for sale . . . in this state." *Id.* at §§ 1331.01(B)(4), 1331.04. At the same time, § 3935.06 permits:

> Co-operation among rating bureaus, or among rating bureaus and insurers, in rate making or in other matters covered by sections 3935.01 to 3935.17, inclusive, of the Revised Code . . . provided the filings resulting from such co-operation are subject to all such sections which are applicable to filings generally. The superintendent may review such co-operative activities and practices and if, after a hearing, he finds that any such activity or practice is unfair, unreasonable, or otherwise inconsistent with such sections, he may issue a written order specifying in what respects such activity or practice is unfair, unreasonable, or otherwise inconsistent, and requiring the discontinuance of such activity or practice.

*Id.* at § 3935.06. The issue that we must decide, then, is whether the specific language of § 3935.06 carves out an exception to the Valentine Act's general prohibition on price-fixing.

In addressing this question, we apply Ohio law. *Rector v. Gen. Motors Corp.*, 963 F.2d 144, 146 (6th Cir. 1992). "When there is no state caselaw construing a state statute, we must predict how the state's highest court would interpret the statute." *F.D.I.C. v. Jeff Miller Stables*, 573 F.3d 289, 298 (6th Cir. 2009) (quoting *United States v. Simpson*, 520 F.3d 531, 535 (6th Cir. 2008)) (internal alterations omitted).

"In the construction of [Ohio] statutes the purpose in every instance is to ascertain and give effect to the legislative intent . . . ." *Carter v. Div. of Water, City of Youngstown*, 65 N.E.2d 63, 63 (Ohio 1946); *see also Stevens v. Ackman*, 743 N.E.2d

901, 909 (Ohio 2001) (citing *Carter*, 65 N.E.2d at 63). "In order to determine legislative intent it is a cardinal rule of statutory construction that a court must first look to the language of the statute itself." *State v. Jordan*, 733 N.E.2d 601, 605 (Ohio 2000). If a statute's language is clear and unambiguous, Ohio courts are "required to apply [that] plain language." *Jacques v. Manton*, 928 N.E.2d 434, 438 (Ohio 2010). If, however, "the language is susceptible of more than one reasonable interpretation," *Jordan*, 733 N.E.2d at 605, the statute is ambiguous. In that case,

> the court, in determining the intention of the legislature, may consider among other matters:
>> (A) The object sought to be attained;
>> (B) The circumstances under which the statute was enacted;
>> (C) The legislative history;
>> (D) The common law or former statutory provisions, including laws upon the same or similar subjects;
>> (E) The consequences of a particular construction;
>> (F) The administrative construction of the statute.

OHIO REV. CODE § 1.49.

If two statutes—one general and one specific—are in conflict, "they shall be construed . . . so that effect is given to both. If the conflict between the provisions is irreconcilable, the [specific] provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail." *Id.* at § 1.51. "If statutes enacted at the same or different sessions of the legislature are irreconcilable, the statute latest in date of enactment prevails." *Id.* at § 1.52; *see also List v. Burley Tobacco Growers' Coop. Ass'n*, 151 N.E.2d 471, 479 (Ohio 1926) (holding that later-enacted statute permitting cooperation in marketing agricultural products was an exception to the Valentine Act).

Appellants urge that the plain language of § 3935.06 resolves this case. Specifically, they contend: "[b]y its express terms, the statute permits cooperation among rating bureaus, or among rating bureaus and insurers—*not among insurers themselves*." Appellants Br. at 19 (emphasis in original). This is one possible interpretation of the statute, which allows "[c]o-operation among rating bureaus, or among rating bureaus and insurers, in rate making

or in other matters covered by sections 3935.01 to 3935.17, inclusive, of the Revised Code." OHIO REV. CODE § 3935.06.

However, rating bureaus themselves rely on cooperation among insurers. Appellants' own characterization is that "[t]he purpose of a rating bureau is to compile the loss experience of many insurers so that individual insurers and the ODI may benefit from a broader database and better predict future losses." Appellants' Reply Br. at 16. If insurers did not cooperate with each other in this data-swapping exercise, rating bureaus would not exist. Of course, the statute does not specifically authorize collusive rate submissions; this is why "the superintendent may review such co-operative activities and practices." OHIO REV. CODE § 3935.06. Still, the Code explicitly provides that rating bureaus are legal. *See ibid.* (providing registration requirements for rating bureaus). As such, it contemplates cooperation among insurers in rate-making. A specific provision authorizing such conduct would be redundant.

Section 3935.06, then, "is susceptible of more than one reasonable interpretation." *Jordan*, 733 N.E.2d at 605. Accordingly, we must turn to extrinsic indicia of legislative intent. *See* OHIO REV. CODE § 1.49. As the district court noted, before 1953, when Title XXXIX was enacted, § 9592 of the Ohio General Code governed insurance. At the beginning of that statute, the General Assembly wrote: "[t]he purpose of this act is to promote the public welfare by regulating insurance rates to the end they shall not be excessive, inadequate or discriminatory, and to authorize and regulate cooperative action among insurers in rate making and other matters within the scope of this act." OHIO GEN. CODE § 9592-1 (Eff. Dec. 31, 1947). Insurers would not, of course, be liable under the Valentine Act, given this language. The plain intent of the legislature is to allow what the antitrust law prohibits: coordinated action among market participants in price-setting. Ohio courts are bound to honor such an expressed legislative intent. *See State ex rel. Moore Oil Co. v. Dauben*, 124 N.E. 232, 234 (Ohio 1919) ("Where the lawmaking body declares its own intention in the enactment of a particular law, or defines the sense of the words employed, it is within the exercise of its legislative power, and its own construction of its language should be followed.").

The legislature, though, did not include § 9592-1's statement of purpose in the Revised Code. And while it "specifically stated in Section 1.24 that it did not intend to change the law as heretofore expressed by the section or sections of the General Code," *State v. Kotapish*, 171 N.E.2d 505, 507 (Ohio 1960) (internal punctuation omitted); *see also Ohio Bank & Sav. Co.*, 411 F.2d 801, 803 (6th Cir. 1969) (holding that, in light of OHIO REV. CODE § 1.24, the legislature did not intend substantive change in law), that savings clause appears to deal only with numbering and minor grammatical changes.[5] The Ohio Supreme Court has not determined how § 1.24 applies when language added or deleted would significantly alter parties' rights and obligations.

We need not resolve this question because § 1.24 does not apply to Title XXXIX. Section 3901.01 provides: "it is the intent of the general assembly not to change the law as expressed by Title 39 of the Revised Code." *Id.* at § 3901.01. This specific continuation clause is stronger than the general clause in § 1.54, which replaced § 1.24: it is not limited by its terms to language that is "the same as the prior statute." *Id.* at § 1.54. Rather, it preserves all of the substantive law in Title XXXIX, regardless of wording. The legislature clearly intended that combinations of insurers not be subject to antitrust scrutiny under § 9592-1; the plain language of § 3901.01 preserves insurance law as formerly expressed. The intent of the legislature, then, seems to be that insurers may cooperate in rate-making activities.

The context of the Insurance Code's enactment and other provisions in the Code confirm this conclusion. Before 1944, the Supreme Court treated the business of insurance as outside of interstate commerce. *See Paul v. Virginia*, 75 U.S. 168, 183 (1868) ("Issuing a policy of insurance is not a transaction of commerce."); *New York Life Ins. Co. v. Cravens*, 178 U.S. 389, 401 (1900) ("The business of insurance is not commerce."). The States, therefore, were able to regulate insurance as they saw fit. At that time, Ohio exempted insurance from antitrust scrutiny because it was not trade, commerce, or a commodity, within the meaning of the Valentine Act. *See State v. Bovee*, 17 Ohio Dec. 663 (Ohio Com. Pl. 1907).

---

[5]Section 1.54 replaced § 1.24. It provides: "A statute which is reenacted or amended is intended to be a continuation of the prior statute and not a new enactment, so far as it is the same as the prior statute." OHIO REV. CODE § 1.54.

*United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), changed the landscape of insurance regulation. There, the Court held that insurance did qualify as interstate commerce, and thus was subject to the Sherman Act's strictures. In response, Congress passed the McCarran-Ferguson Act. As discussed above, Congress's primary concern was "that cooperative ratemaking efforts be exempt from the antitrust laws." *Royal Drug*, 440 U.S. at 221. However, as President Roosevelt pointed out, "Congress did not intend to permit private rate fixing, which the Antitrust Act forbids, but was willing to permit actual regulation of rates by affirmative action of the States." *Id.* at 224 (quoting S. Rosenman, *supra* at 587). Thus, the states had to pass their own laws regulating the business of insurance, lest the Sherman Act apply full-force. 15 U.S.C. § 1012(b). In this context, Ohio passed its insurance code, which included § 9592-1. The declaration of intent, then, matches the concerns that animated the McCarran-Ferguson Act—both federal and state legislatures sought to promote cooperation among insurers in rate-making.

Two statutory provisions also support this interpretation. First, § 3935.10 permits "every insurer . . . [to] exchange information and experience data with . . . insurers . . . in other states and [to] consult with them with respect to rate making and the application of rating systems." OHIO REV. CODE § 3935.10. That the Code expressly allows both nationwide data pooling and local rating bureaus where insurers pool information with each other suggests that the legislature contemplated widespread collaboration among insurers in the rate-setting context. Second, "[t]he superintendent may review . . . co-operative activities and practices and if . . . he finds that any such activity or practice is unfair, unreasonable, or otherwise inconsistent with such sections, he may issue a written order . . . requiring the discontinuance of such activity or practice." *Id.* at § 3935.06. This remedial procedure is consistent with the intent that insurers cooperate. The superintendent's ability to police is a safeguard against abuse. This power would be unnecessary if private parties could bring antitrust actions against insurers under the Valentine Act.

Therefore, applying Ohio principles of statutory construction, we hold that § 3935.06 permits cooperation among insurers. The question that remains is whether such cooperation nevertheless violates the Valentine Act. The answer is a straightforward "no." The Ohio

Revised Code's rules of statutory construction provide that, when two statutory provisions are in irreconcilable conflict, "the [specific] provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail." OHIO REV. CODE § 1.51. The General Assembly adopted the Valentine Act in 1898. 1898 Ohio Laws 143. It passed the Insurance Code in 1947. 1947 Ohio Laws 397. There is no indication that the Valentine Act was ever amended, expressly to displace the provisions of the Insurance Code that allow cooperation. Thus, the Insurance Code acts as an exception to the Valentine Act. *See* OHIO REV. CODE §§ 1.51, 1.52.

Appellants' Ohio antitrust claims, then, are not valid. Section 3935.06 of the Revised Code permits Appellees' allegedly collusive behavior, and so the Valentine Act does not apply. The district court was correct to dismiss these state-law claims.

IV

Although we resolve this appeal based on the analysis above, we acknowledge that the parties briefed and argued another issue: whether the filed-rate doctrine eliminates Appellants' damages claims, and any injunctive claims that would interfere with an already-filed rate. The court below, like most other courts to consider antitrust challenges to title-insurance rate-setting, addressed this issue. *See, e.g.*, *McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 235–42 *8 (3d Cir. 2012); *In re New Jersey Title Ins. Litig.*, ---- F.3d ----, 2012 WL 2149471, at *2–*7 (3d Cir. June 14, 2012); *Dolan v. Fidelity Nat'l Title Ins. Co.*, 365 F. App'x 271, 273–76 (2d Cir. 2010); *Winn v. Alamo Title Ins. Co.*, 372 F. App'x 461, 461 (5th Cir. 2010); *In re Pennsylvania Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 672–86 (E.D. Pa. 2009); *McCray v. Fidelity Nat'l Title Ins. Co.*, 636 F. Supp. 2d 322, 326–34 (D. Del. 2009); *see also Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 886–891 (10th Cir. 2011) (holding that New Mexico filed-rate doctrine barred title insurance rate-setting antitrust claim). The sounder approach, however, is to reject Appellants' claims based only on statutory antitrust exemptions, without reference to the filed-rate doctrine.

The filed-rate doctrine prevents private parties from recovering antitrust damages based on a rate properly filed with, and approved by, an appropriate regulatory body.[6]  *See Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409 (1986); *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156 (1922) (Brandeis, J.).  It deals only with private parties' remedies, and does not, itself, remove actors from all antitrust scrutiny.  *See Square D*, 476 U.S. at 422 n.28 ("[A] critical distinction remains between an absolute immunity from *all* antitrust scrutiny and a far more limited nonavailability of the private treble-damages remedy.").  By contrast, the McCarran-Ferguson Act bars all federal antitrust actions involving "the business of insurance to the extent that such business is . . . regulated by State law," 15 U.S.C. § 1012(b), unless the alleged antitrust violation is an "agreement to boycott, coerce, or intimidate, or [an] act of boycott, coercion, or intimidation." *Id.* at § 1013(b).[7]  Title XXXIX of the Ohio Revised Code, which regulates title insurance, allows concerted action in rate-setting.  Accordingly, Appellants have no claim under federal or state law.  The filed-rate doctrine's limitation on remedy is irrelevant.[8]

V

The McCarran-Ferguson Act and Title XXXIX of the Ohio Revised Code are complete bars to Appellants' federal and state antitrust claims.  In light of this holding, we need not consider whether the filed-rate doctrine applies in this case.  We AFFIRM the judgment of the district court, dismissing Appellants' complaint with prejudice.

---

[6]The filed-rate doctrine can also bar injunctive relief, if the injunction that plaintiffs seek is no more than a request for a different rate-making decision, *Dolan*, 365 F. App'x. at 276, or if the injunction would force the court to alter an existing rate.  The filed-rate doctrine applies in this scenario because it is designed "to protect the exclusive authority of the agency to accept or challenge [rates]." *Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 420 (1st Cir. 2000) (Boudin, J.).

[7]Appellants concede there is no boycott, coercion, or intimidation here.

[8]The district court's opinion illustrates why it is preferable to address antitrust immunity before the filed-rate doctrine.  The opinion below offers a thorough discussion of the filed-rate doctrine, culminating in a holding that Appellants' damages claims had to be dismissed, but their injunctive claims might be permissible, as long as those claims did not interfere with established rates.  Later, however, the district court dismissed Appellants' claims with prejudice because "the McCarran-Ferguson Act is a complete bar to Plaintiffs' federal antitrust claim . . . [and] [t]he same logic holds true for Plaintiffs' Valentine Act claim."  Allowing Appellants to re-plead either cause of action, it wrote, would "be an exercise in futility."  This is true.  But it also means that the court's discussion of the filed-rate doctrine was unnecessary: the McCarran-Ferguson Act and the Ohio Insurance Code barred the suit wholesale.